STATE OF NEBRASKA, APPELLEE, V.
SCOTT A. HARROLD, APPELLANT.
593 N.W. 2d 299

Filed May 7, 1999.    No. S-97-1167.

Dennis R. Keefe, Lancaster County Public Defender, and Robert G. Hays for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

Bruce A. Taylor, Paul J. McGeady, and Robin S. Whitehead for amici curiae Senator James Exon, Retired; National Law Center for Children and Families, Inc.; and Morality in Media, Inc.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

GERRARD, J.

## I. NATURE OF CASE

Scott A. Harrold was, pursuant to jury verdict, adjudged guilty in the Lancaster County Court of producing or distributing obscene material, in violation of Neb. Rev. Stat. § 28-813(1) (Reissue 1995), and the county court fined Harrold $1,000. On appeal, the district court affirmed the conviction and fine, but the Nebraska Court of Appeals reversed the conviction and dismissed the case, based on its determination that the material produced and distributed by Harrold was not obscene and was consequently protected by the First Amendment to the U.S. Constitution. See *State v. Harrold*, 7 Neb. App. 842, 585 N.W.2d 532 (1998). We granted the State's petition for further review, and for the reasons stated herein, we reverse the judgment of the Court of Appeals and remand this cause with directions to reinstate the judgment of the district court which had affirmed the judgment of the county court.

## II. FACTUAL BACKGROUND

Harrold applied in late 1994 to produce an ongoing local series called "Cosmic Comedy," to be broadcast by TV Transmission, Inc., doing business as CableVision, on a public access channel of Lincoln cable television. The show began to air in January 1995, and Harrold's 6-month contract was renewed in June 1995. Harrold applied for a midnight time slot, indicating in his application that his show would feature sexual and/or excretory activities or organs and include adult movie reviews.

On September 14, 1995, Harrold delivered a videotaped episode of "Cosmic Comedy" to CableVision's Lincoln studios. In addition to delivering the videotape, Harrold also produced and appeared in the videotape. The contents of the videotape can briefly be described as 14 minutes of a costumed man making strange faces, followed by over a minute of a costumed, reclining man masturbating.

Shortly after Harrold delivered the videotape, it was viewed by David Grooman, CableVision's public access coordinator. After viewing the videotape, Grooman made a copy of it and

provided the copy to the police. Alan Townsend, a sergeant in the Lincoln Police Department technical investigations unit, went to Harrold's home on September 23, 1995, and cited Harrold for the production or distribution of obscene material.

On October 3, 1995, a complaint was filed in the county court, charging that Harrold "did knowingly copy, print, manufacture, prepare, produce, or reproduce obscene material for the purpose of distribution; or did knowingly publish, circulate, or distribute, or exhibit obscene material," in violation of § 28-813. After a jury trial in the county court, Harrold was adjudged guilty of violating § 28-813, and the court fined Harrold $1,000. Harrold appealed to the district court, which affirmed the judgment of the county court. The Court of Appeals reversed the judgment, determining that Harrold was prejudiced by the exclusion of evidence, that the videotape itself was not obscene and was protected by the First Amendment, and that the case should therefore be dismissed. *State v. Harrold, supra.* We granted the State's petition for further review of the Court of Appeals' decision.

### III. PETITION FOR FURTHER REVIEW

#### 1. ASSIGNMENTS OF ERROR

The State assigns, consolidated and restated, that the Court of Appeals erred by (1) determining that the videotape was "speech" protected by the First Amendment, (2) substituting its judgment for that of the jury on the factual finding that the videotape was obscene, and (3) finding error by the trial court on certain challenged evidentiary rulings.

#### 2. CONTENTS OF EXHIBIT 2

A more detailed examination of the subject videotape provides a foundation for our analysis. There were actually two videotapes introduced as exhibits at trial, as "exhibit 1" and "exhibit 2." Exhibit 1, the videotape actually delivered by Harrold, was recorded on ¾-inch videotape, which is a professional grade of tape. Exhibit 2 is the copy of exhibit 1 made by Grooman and given to the police department. Exhibit 2 was made on ½-inch videotape, or VHS tape, which is the grade of tape used in a commercially available, consumer videocassette recorder. Exhibit 2 was shown to the jury, but exhibit 1 was not.

Exhibit 2 is approximately 16 minutes in length. The first 14 minutes 10 seconds of exhibit 2 depicts Harrold in costume, and the character's location and activities are difficult to discern. The testimony at trial indicated that the character depicted was "Cozblah," an extraterrestrial who had become lost in space. The videotape shows nothing except Cozblah's head, as the character makes strange, distorted faces. If there is any meaning or import to the faces being made, we are unable to determine what that might be. To portray Cozblah, Harrold wears sunglasses, a large artificial nose, a white goatee-style beard, a white cap, and some sort of white fabric wrapping around the back of his head.

This visual depiction is accompanied by screeching noises of various pitches, representing no intelligible dialog or melody. Harrold's testimony at trial indicated that the noise was Cozblah's voice, repeatedly saying that he was Cozblah and that he was lost in space. Harrold testified that the voice had been processed and distorted by various techniques.

A little over 14 minutes into the presentation, the picture abruptly changes and another character appears. This is reportedly "Crotchy the Clown," again portrayed by Harrold. This character is reclining and is shown from head to upper thigh, and he appears to be completely nude. His erect genitalia are completely and prominently displayed. Harrold's costume again includes sunglasses and an artificial nose, but these are different from the props used in the Cozblah costume. Harrold is also wearing white makeup around his lips and a bushy black beard, but whether this beard is artificial or Harrold's own beard is unclear.

For the next minute 16 seconds, Harrold is shown masturbating. While he occasionally pauses, he is primarily shown vigorously manipulating his erect genitalia. Harrold's masturbation is introduced by voice-over dialog that is garbled but comprehensible. The dubbed voice says, "Here's a little clip from one of Crotchy's X-rated movies. This is about NC-17 rated show, for the ladies only. Thank you for coming."

After a little more than a minute, the scene ends, and a blue screen appears. Harrold does not ejaculate before the scene ends. The blue screen is accompanied by another voice-over,

which is again garbled but comprehensible. The dubbed voice says, "Well, I hope you enjoyed that, ladies. Cozblah and the Crotchyman, the clown, are copyrighted characters. Hope you enjoyed it. Get lost there, right wingers; you're talking left wing here baby . . . ."

Harrold's testimony at trial provides some context for the comments contained in the videotape. At trial, Harrold testified that the masturbation sequence was not initially created for "Cosmic Comedy," but was in fact a scene from a longer adult movie that Harrold had filmed. Harrold also testified that the sequence was included in response to a comment he received from a female viewer after a previous episode of "Cosmic Comedy" in which he had included footage of a woman removing her clothing and then masturbating. Reportedly, the viewer had complained that the show included a nude woman but not a nude man, and Harrold indicated that the Crotchy character's masturbation was a response to that complaint.

### 3. CONTENTS OF EXHIBIT 1

In examining the videotape, we are cognizant of the Court of Appeals' dissenting judge's concern that material from exhibit 1 had been excluded from exhibit 2. *State v. Harrold*, 7 Neb. App. 842, 585 N.W.2d 532 (1998) (Miller-Lerman, Chief Judge, concurring in part, and in part dissenting). The label for exhibit 1 does indicate that it is 20 minutes in length, while exhibit 2 actually plays for slightly more than 16 minutes. We do not find, however, that this fact is significant to our decision. The testimony at trial indicated that exhibit 2 was an accurate copy of exhibit 1. The record reveals that some material on the exhibit 2 videotape was erased, but our review of the record indicates that this was extraneous material and not part of the copy of exhibit 1.

We find no evidence in the record indicating that any part of exhibit 1 was not accurately copied onto exhibit 2. Neither party has complained of any imprecision, even in their briefs on petition for further review to this court after the opinion from the Court of Appeals called attention to this potential issue. In short, we find nothing in the record indicating that exhibit 2 is not a true and accurate copy of exhibit 1, and absent argument on that point from either party, we will not address the issue further.

## 4. VIDEOTAPE AS SPEECH

The State assigns as error that the Court of Appeals treated the videotape as speech protected by the First Amendment. The State argues that Harrold is depicted on the videotape engaging in nonexpressive conduct, which is without First Amendment protection. The State's argument is without merit.

If Harrold had masturbated on a street corner rather than in a videotaped program, the State's argument might be worthy of consideration. It is well established, however, that videotape recordings are subject to First Amendment protection. See, e.g., *New York v. P. J. Video, Inc.*, 475 U.S. 868, 106 S. Ct. 1610, 89 L. Ed. 2d 871 (1986); *Main Street Movies v. Wellman*, 251 Neb. 367, 557 N.W.2d 641 (1997). Moreover, the State's argument ignores the requirements of the very statute it utilized to prosecute Harrold.

Harrold was convicted of distributing obscene material, in violation of § 28-813(1). "Material," for purposes of that statute, is defined as including "any picture, drawing, photograph, figure, image, motion picture . . . television production, other pictorial representation or electric reproduction, recording transcription, mechanical or otherwise . . . ." Neb. Rev. Stat. § 28-807(7) (Reissue 1995). This definition clearly encompasses videotapes. As will be analyzed more completely below, the definition of "obscene" contained in § 28-807(10) is coextensive with the First Amendment standards established by the U.S. Supreme Court in *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), and developed in subsequent cases. Thus, since the State is required to satisfy First Amendment standards of both the U.S. Constitution and the Nebraska statutes, the State's assignment of error is without merit.

## 5. OBSCENITY OF EXHIBIT 2

We now turn to the issue that was determinative for the Court of Appeals: whether Harrold's videotape is obscene. The State assigns that the Court of Appeals erred in its obscenity analysis which resulted in the Court of Appeals' determination that the videotape was not legally obscene.

## (a) Definition of Obscenity

Initially, we point out that "obscenity is not within the area of constitutionally protected speech or press." *Roth v. United States*, 354 U.S. 476, 485, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957). Accord *New York v. Ferber*, 458 U.S. 747, 754, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982). Thus, "obscene" speech can be prohibited or otherwise regulated without violating the prohibitions of the First Amendment to the U.S. Constitution. The Supreme Court has limited the definition of obscenity to those materials which, "taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. at 24. See, *Smith v. United States*, 431 U.S. 291, 97 S. Ct. 1756, 52 L. Ed. 2d 324 (1977); *Jenkins v. Georgia*, 418 U.S. 153, 94 S. Ct. 2750, 41 L. Ed. 2d 642 (1974). Sexually oriented materials are not obscene unless all three elements of the *Miller* test are satisfied. *U.S. v. Various Articles of Obscene Merchandise*, 709 F.2d 132 (2d Cir. 1983).

First, a matter is not obscene under Nebraska law unless, taken as a whole, "an average person applying contemporary community standards would find that the work . . . predominantly appeals to the prurient interest or a shameful or morbid interest in nudity, sex, or excretion." § 28-807(10)(a). This phraseology varies slightly in detail, but not significantly, from the *Miller* requirement that "'the average person, applying contemporary community standards,' would find that the work, taken as a whole, appeals to the prurient interest." *Miller v. California*, 413 U.S. at 24. To decide this question of fact, the triers of fact must look at the work depicting sexual conduct as a whole and determine whether its dominant theme is one which goes substantially beyond customary limits of candor in appealing to a shameful or morbid interest in sex. See, *Miller v. California, supra*; *Roth v. United States, supra*.

The triers of fact must use an average citizen of that Nebraska community, not a particularly susceptible or particularly insensitive one, as a norm for this determination. See *Miller v. California, supra*. Triers of fact may not use their own

views as appropriate local norms, but may use their knowledge of the views of average people in their own community as an appropriate norm for deciding if a matter " ' "appeals to prurient interest." ' " *Hamling v. United States*, 418 U.S. 87, 102, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974).

Second, even though a matter depicts hardcore sexual conduct which appeals to the prurient interest, it is not obscene unless, taken as a whole, "the work . . . depicts or describes in a patently offensive way sexual conduct specifically set out in sections 28-807 to 28-829." § 28-807(10)(b). In *Miller v. California*, 413 U.S. 15, 25, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), the Court took occasion to give examples of the type of sexual conduct that may be regulated by state law:

It is possible, however, to give a few plain examples of what a state statute could define for regulation under part (b) of the standard announced in this opinion, *supra*:

(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

(b) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

The Legislature, taking its cue from *Miller v. California, supra*, has chosen to regulate the patently offensive depiction of certain sexual conduct that includes "acts of masturbation . . . or prolonged physical contact with a person's clothed or unclothed genitals . . . ." § 28-807(15). Consequently, triers of fact must decide whether a local Nebraska citizen of average susceptibilities would be patently offended by depictions of certain defined sexual conduct at issue in a case.

Third, even though the material appeals to the prurient interest and is patently offensive, it cannot be obscene constitutionally unless the work taken as a whole "lacks serious literary, artistic, political, or scientific value." § 28-807(10)(c). *Miller v. California, supra*. Material dealing with sexual conduct in a manner which advocates ideas, which contributes to or illustrates scientific discussion, or which adds to the general body of art and literature in our culture is protected by the 1st and 14th Amendments to the U.S. Constitution. See *Miller v. California,*

*supra.* Therefore, appellate courts examine decisions on this third prong more closely in order to ensure that First Amendment protection of ideas, however unpopular, is maintained. *Smith v. United States,* 431 U.S. 291, 97 S. Ct. 1756, 52 L. Ed. 2d 324 (1977). It is clear that Nebraska's statutory definition of obscenity is patterned upon, and coextensive with, the language of *Miller v. California, supra.* See *State v. Embassy Corp.,* 215 Neb. 631, 340 N.W.2d 160 (1983).

The State bears the burden of proving all three elements of obscenity to the satisfaction of the trier of fact. See *U.S. v. Various Articles of Obscene Merchandise,* 709 F.2d 132 (2d Cir. 1983). The critical question in this court, as in the courts below, is whether Harrold's videotape is obscene within the meaning of § 28-807(10) and First Amendment jurisprudence.

(b) Standard of Appellate Review

Recognizing that Harrold was convicted of violating § 28-813 pursuant to a jury verdict, we must next determine what standard of review to apply to the jury's determination. The standard of review is often dispositive of an issue on appeal, and we acknowledge that the question of the proper role of an appellate court in obscenity cases is one which has engendered a variety of opinions. Some courts have held that the appellate court is obligated to make an independent, de novo review of all the evidence. See, e.g., *Dyke v. State,* 232 Ga. 817, 209 S.E.2d 166 (1974), *cert. denied* 421 U.S. 952, 95 S. Ct. 1687, 44 L. Ed. 2d 106 (1975); *People v. Anderson,* 130 Ill. App. 3d 318, 473 N.E.2d 1345, 85 Ill. Dec. 540 (1985), *aff'd* 112 Ill. 2d 39, 490 N.E.2d 1263, 96 Ill. Dec. 58 (1986). Other jurisdictions review the record only for substantial evidence. See, *United States v. Cutting,* 538 F.2d 835 (9th Cir. 1976), *cert. denied* 429 U.S. 1052, 97 S. Ct. 766, 50 L. Ed. 2d 769 (1977); *Court v. State,* 63 Wis. 2d 570, 217 N.W.2d 676 (1974). The proper standard of review, as noted by Professor Frederick F. Schauer, *The Law of Obscenity* (1976), lies somewhere in between. Professor Schauer accurately points to *Jenkins v. Georgia,* 418 U.S. 153, 94 S. Ct. 2750, 41 L. Ed. 2d 642 (1974), as the clearest exposition by the Court of the correct standard of review by appellate courts.

In *Jenkins v. Georgia,* where the Supreme Court reversed the conviction of a theater manager for the exhibition of the motion picture "Carnal Knowledge," the Court turned to the language of *Miller v. California,* 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), to evaluate the standard of review:

> *Miller* states that the questions of what appeals to the "prurient interest" and what is "patently offensive" under the obscenity test which it formulates are "essentially questions of fact." [Citation omitted.] "When triers of fact are asked to decide whether 'the average person, applying contemporary community standards' would consider certain materials 'prurient' it would be unrealistic to require that the answer be based on some abstract formulation . . . ."

*Jenkins v. Georgia,* 418 U.S. at 159.

The Court went on to state:

> Even though questions of appeal to the "prurient interest" or of patent offensiveness are "essentially questions of fact," it would be a serious misreading of *Miller* to conclude that juries have unbridled discretion in determining what is "patently offensive." Not only did we there say that "the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary" [citation omitted], but we made it plain that under that holding "no one will be subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct . . . ."

*Jenkins v. Georgia,* 418 U.S. at 160.

After the decision in *Jenkins v. Georgia, supra,* this court held that

> the usual test in reviewing a jury verdict, i.e., is the finding supported by sufficient evidence, is not applicable in First Amendment cases and since it is only "obscenity" that is excluded from constitutional protection, the question whether a particular work is obscene is an issue which

must be decided by the court as a matter of law, in reviewing such cases.

*State v. American Theater Corp.*, 194 Neb. 84, 89, 230 N.W.2d 209, 212-13 (1975).

The Supreme Court, however, subsequently refined the requirements for appellate review of obscenity cases, stating:

> Our decision that contemporary community standards must be applied by juries in accordance with their own understanding of the tolerance of the average person in their community does not mean, as has been suggested, that obscenity convictions will be virtually unreviewable. We have stressed before that juries must be instructed properly, so that they consider the entire community and not simply their own subjective reactions, or the reactions of a sensitive or of a callous minority. . . . The type of conduct depicted must fall within the substantive limitations suggested in *Miller* . . . . The work also must lack serious literary, artistic, political, or scientific value before a conviction will be upheld; this determination is particularly amenable to appellate review. Finally, it is always appropriate for the appellate court to review the sufficiency of the evidence.

(Citations omitted.) *Smith v. United States*, 431 U.S. 291, 305-06, 97 S. Ct. 1756, 52 L. Ed. 2d 324 (1977).

The "substantive limitations" referred to in *Smith v. United States, supra*, include, but are not limited to, "[p]atently offensive representations or descriptions of *masturbation*, excretory functions, and *lewd exhibition of the genitals*." (Emphasis supplied.) *Miller v. California*, 413 U.S. 15, 25, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973).

A comprehensive reading of *Smith v. United States, supra*, and the Supreme Court's First Amendment jurisprudence leads us to the conclusion that an appellate court's independent review of the evidence in obscenity cases does not require the appellate court to determine the issue of obscenity vel non as a matter of law, nor does it bar the appellate court from extending due deference to the trier of fact on essentially factual issues. Any language to the contrary in *State v. American Theater Corp., supra*, is disapproved.

*Miller v. California, supra,* described, as a matter of substantive constitutional law, the type of "hardcore" sexual material that might be constitutionally regulated under the First Amendment.

> While the particular descriptions there contained were not intended to be exhaustive, they clearly indicate that there is a limit beyond which neither legislative draftsmen nor juries may go in concluding that particular material is "patently offensive" within the meaning of the obscenity test set forth in the *Miller* cases.

*Hamling v. United States*, 418 U.S. 87, 114, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974). "While this did not purport to be an exhaustive catalog of what juries might find patently offensive, it was certainly intended to fix substantive constitutional limitations, deriving from the First Amendment, on the type of material subject to such a determination." *Jenkins v. Georgia*, 418 U.S. 153, 160-61, 94 S. Ct. 2750, 41 L. Ed. 2d 642 (1974).

The Supreme Court has indicated that an appellate court must determine, as a matter of constitutional law, whether particular material is within the "substantive limitations" imposed by the First Amendment. The independent review conducted by an appellate court in First Amendment cases is intended "both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Bose Corp. v. Consumers Union of U. S., Inc.*, 466 U.S. 485, 505, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984).

Thus, a determination of obscenity requires a two-stage inquiry that focuses first on the substantive content of the materials to see whether they depict or describe "hardcore" types of sexual conduct that the trier of fact could constitutionally label "patently offensive" according to contemporary community standards, i.e., whether it qualifies as possibly obscene. See *U.S. v. Various Articles of Obscene Merchandise*, 709 F.2d 132 (2d Cir. 1983) (citing *Smith v. United States, supra*). In other words, the court initially functions as a constitutional gatekeeper. Once this threshold "substantive component" or condition is satisfied, the trier must then determine whether, as a mat-

ter of fact, the material taken as a whole predominantly appeals to the prurient interest or a shameful or morbid interest in nudity, sex, or excretion; is patently offensive; and lacks serious literary, artistic, political, or scientific value, as set forth in § 28-807(10). See *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973).

Accordingly, if we conclude, as a matter of substantive constitutional law, that the material is within the range of "hard-core" sexual material defined in *Miller v. California, supra*, the three-prong *Miller* obscenity test must then be utilized to determine if the material is outside the ambit of First Amendment protection. The first two prongs of the *Miller* test, however, are primarily factual issues, to be measured by "contemporary community standards." As the trier of fact is obviously better suited to determine the limits of tolerance in a particular community regarding the "prurient interest" test and the "patently offensive" test, a reviewing court should give due deference to the findings of the trier of fact regarding these essentially factual determinations. See *City of Farmington v. Fawcett*, 114 N.M. 537, 843 P.2d 839 (N.M. App. 1992). See, also, *U.S. v. Schein*, 31 F.3d 135 (3d Cir. 1994); *Alexander v. Thornburgh*, 943 F.2d 825 (8th Cir. 1991); *United States v. Langford*, 688 F.2d 1088 (7th Cir. 1982); *United States v. Cutting*, 538 F.2d 835 (9th Cir. 1976); *Commonwealth v. 707 Main Corp.*, 371 Mass. 374, 357 N.E.2d 753 (1976). In other words, the appellate court must make an independent review of the first two prongs, but the question to be asked is not whether the materials are obscene, but, rather, whether the materials create a jury issue as to obscenity.

The third prong of the *Miller* test, relating to the literary, artistic, political, or scientific value of the work, presents an issue that is, as the Supreme Court noted in *Smith v. United States*, 431 U.S. 291, 97 S. Ct. 1756, 52 L. Ed. 2d 324 (1977), more susceptible to appellate review. See *City of Farmington v. Fawcett, supra*. The Supreme Court has held that the "value" of a work is not to be determined by reference to contemporary community standards. *Pope v. Illinois*, 481 U.S. 497, 107 S. Ct. 1918, 95 L. Ed. 2d 439 (1987). Since the appellate court possesses expertise and authority on this issue that is at least equal

to that of the trier of fact, and as the Supreme Court has identified this prong of the *Miller* test as being more susceptible to appellate review, we conclude that the third prong, i.e., "value" of the work, must be weighed independently by an appellate court after a de novo review of the relevant evidence.

This standard of review preserves appropriate deference to the trier of fact in determining social consensus regarding the first two prongs of the *Miller* test, while allowing an appellate court, after an independent review of the evidence, to preclude public sentiment from eroding the values of the First Amendment. It has been written that the purpose of the First Amendment is to preserve "the independence of public discourse so that a democratic will within a culturally heterogeneous state can emerge under conditions of neutrality, and so that individuals can use the medium of public discourse to persuade others to experiment in new forms of community life." Robert C. Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and* Hustler Magazine v. Falwell, 103 Harv. L. Rev. 601, 684 (1990). If this purpose is to be met, First Amendment jurisprudence must appropriately balance the need for individual expression with the demands of social harmony; one key to achieving this balance is found in appropriate regard for the roles of appellate courts and triers of fact in determining what the government may legally regulate and what the community is prepared to tolerate.

Based on the foregoing authority and analysis, we hold that in reviewing a fact finder's determination that certain material is obscene, the first duty of an appellate court is to conduct an independent review and determine, as a matter of constitutional law, if the material falls within the substantive limitations set forth in *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), i.e., the depiction of certain hardcore sexual material that may be constitutionally regulated under the First Amendment. Thereafter, the appellate court must review the determinations of the trier of fact pursuant to the three-part obscenity standard set forth in *Miller v. California, supra,* and § 28-807(10). In doing so, the appellate court should give appropriate deference to the trier of fact regarding the first two

prongs, i.e., the "prurient interest" test and the "patently offensive" test, as they depend on knowledge of "contemporary community standards" that is uniquely within the province of the trier of fact.

In a criminal obscenity case such as this one, due deference to the trier of fact means that an appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are within the fact finder's province for disposition. See *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998).

Finally, the appellate court should apply a de novo review in considering the third prong, i.e., "value" of the material at issue, since this determination does not depend upon community standards and is particularly amenable to appellate review.

### (c) Review of Jury Verdict

Based on the foregoing standard of review, we conclude that the jury's finding of obscenity in this case was proper and supported by the evidence.

### (i) Threshold Determination

Initially, we note that Harrold's act of masturbation on the videotape is clearly within the range of sexual conduct which the trier of fact could label "patently offensive" in accordance with contemporary community standards. Both *Miller v. California, supra*, and the corresponding Nebraska statute, § 28-807(15), specifically include masturbation as an example of the type of sexual conduct that may be regulated. In addition, *Miller* includes "lewd exhibition of the genitals," 413 U.S. at 25, as another example of sexual conduct that may be regulated, and Harrold's videotape focused on Harrold's prolonged manipulation of the erect male genitalia in a way that falls within the substantive limitations of *Miller*. Therefore, as a threshold matter, Harrold's videotape qualifies "as possibly obscene." See *U.S. v. Various Articles of Obscene Merchandise*, 709 F.2d 132, 135 (2d Cir. 1983). We further note that the standard set forth in *Miller* and in § 28-807(10) and (15) was reflected in the trial court's instructions to the jury and that the jury was therefore properly instructed in that regard.

### (ii) Prurient Interest

We then turn to the three-part *Miller* test and first consider whether the average person, applying contemporary community standards, could find that the videotape, taken as a whole, appeals to the prurient interest. With regard to the definition of prurient interest, the jury was properly instructed as follows:

> You must determine whether the material appeals to a prurient interest in sex, for unless it does it cannot be obscene. A prurient interest in sex is not the same as a candid, wholesome, or healthy interest in sex. Material does not appeal to the prurient interest just because it deals with sex, or shows nude bodies. Prurient interest is a shameful or morbid interest in sex, nudity or excretion which goes beyond the customary limits of candor.

The substance of this definition was taken directly from *Roth v. United States*, 354 U.S. 476, 487 n.20, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957), and remains an accurate description of the Supreme Court's definition of "prurient interest." See *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S. Ct. 2794, 86 L. Ed. 2d 394 (1985). No objection to this instruction was made by either Harrold or the State.

The jury was further instructed, in relevant parts:

> In determining whether or not the material appeals to a prurient interest in sex, you must determine whether the average person in the community would find that the material has such appeal. People have different views as to the propriety of certain material. What may be prurient to some is not prurient to others. Obscenity is not, however, a matter of individual taste. Your personal opinion as a juror about this material is not a proper basis for determining whether or not the material is obscene or appeals to the prurient interest. Thus, whether you personally believe that the material is good or bad is of no concern in determining whether or not it is obscene; so, too, you may not consider whether in your personal opinion the material is moral or immoral or whether it is likely to be helpful or injurious to public morals. Similarly, whether you personally like or dislike the material, whether it offends or shocks you, may not be considered by you. You personally

may think the material is immoral, shocking or offensive, and yet you must acquit the defendant if the material is not obscene, as the court has defined that term for you. You must judge how the average person in the community would view this material.

. . . .
. . . In determining whether an appeal to the prurient interest is the main and principal appeal of the material, you should consider the intended effect on the intended and probable recipients of the material.

Again, the trial court correctly captured the definition and standards established by the Supreme Court in its instructions with respect to prurient interest. See *Pinkus v. United States*, 436 U.S. 293, 98 S. Ct. 1808, 56 L. Ed. 2d 293 (1978). The question regarding appeal to the prurient interest was properly submitted to the jury for its determination.

An examination of the videotape supports the jury's conclusion that the videotape appealed to a prurient interest. Harrold's masturbation is clearly depicted; in fact, the camera is placed in such a way that Harrold's genitals are prominently displayed and are the primary image visible on the screen during Harrold's masturbation. The masturbation sequence is introduced on the videotape by the statement that it is "for the ladies only." Similarly, when the sequence is complete, the narrator states, "I hope you enjoyed that, ladies." Harrold's trial testimony further establishes that the inclusion of the masturbation scene was intended to address a complaint from a female viewer that "Cosmic Comedy" had not featured enough male sexual activity. Taken together, these facts certainly support the conclusion that Harrold's masturbation was an attempt, however misguided, to sexually appeal to women.

In the instant case, the jury was properly instructed on how to evaluate whether the videotape appealed to an average person's prurient interest in sex, and the record amply supports the jury's determination that the videotape was shameful and went beyond the ordinary limits of candor.

In reaching a different conclusion, the Court of Appeals relied in part on the federal district court's decision in *U.S. v. M-K Enterprises, Inc.*, 719 F. Supp. 871 (D. Neb. 1989). In that

decision, the district court found that in order to appeal to the prurient interest, a work must appeal to the "darker side of sex," and listed the depiction of force, deliberate pain, inanimate insertions, bondage, deception, or the involvement of children or animals as examples of material that would be considered obscene. *Id.* at 878. Based upon that standard, the court determined that certain material presented in that case appealed to the prurient interest, while other material did not.

We determine, however, that the Court of Appeals has misapprehended the context of the federal district court's decision. In that case, the judge was not conducting an appellate review, but was the trier of fact in a bench trial in the U.S. District Court for the District of Nebraska. *Id.* The district court's decision was specifically based on the judge's "understanding of the contemporary community standards of the average person in southeast Nebraska." *Id.* at 878.

In other words, the decision in *U.S. v. M-K Enterprises, Inc., supra,* does not represent a determination that the First Amendment allows only the regulation of sexual material that depicts, for example, force, deliberate pain, inanimate insertions, bondage, deception, or the involvement of children or animals. It is instead a determination, by a trier of fact, of obscenity vel non based upon the trier of fact's understanding of the relevant contemporary community standards.

As such, it is not relevant to our review of the jury's verdict in the present case. It is true that the federal judge's understanding of the contemporary community standard is different from that applied by the jury in the present case, and it is also true that the jury in this case was drawn from essentially the same community whose views the federal judge addressed in *U.S. v. M-K Enterprises, Inc., supra.* The determination of one trier of fact, however, is neither binding nor even relevant to the determination of another trier of fact in a different case.

As noted by the Supreme Court:

> The mere fact juries may reach different conclusions as to the same material does not mean that constitutional rights are abridged. . . . "[I]t is common experience that different juries may reach different results under any crim-

inal statute. That is one of the consequences we accept under our jury system."
*Miller v. California*, 413 U.S. 15, 26 n.9, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973). This principle is even more appropriately applied where the triers of fact are considering different material in different cases. We have also held that in determining an issue of fact in an obscenity case, each case must be determined on evidence peculiar to it alone and not by comparison to fact determinations made by another jury in a similar case. *State v. Embassy Corp.*, 215 Neb. 631, 340 N.W.2d 160 (1983). In the present case, whether Harrold's videotape appealed to the prurient interest of the average person in the community was a determination for the jury to make, and the jury's affirmative determination is supported by the record.

We are also unpersuaded by Harrold's argument, reiterated by the Court of Appeals, that the work "taken as a whole" is not obscene because the sexual conduct depicted occupies little more than the final minute of a 16-minute presentation. The fact that the opening act of Harrold's show is over 14 minutes long does not redeem the whole, given that the first 14 minutes contains no dialog, comprehensible expressive conduct, or, indeed, any meaningful content that this court can discern. Harrold's masturbation can at the very least be recognized for what it is, and it is the only activity depicted on the videotape for which we believe the average person, applying contemporary community standards, would have any frame of reference.

The jury could certainly have found, based upon the record, that the work, as a whole, appealed to the prurient interest. Cozblah the extraterrestrial is hardly Voltaire, and if "[a] quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication," then over a minute of explicit masturbation will not be constitutionally redeemed by over 14 minutes of content-free nonsense. See *Kois v. Wisconsin*, 408 U.S. 229, 231, 92 S. Ct. 2245, 33 L. Ed. 2d 312 (1972).

*(iii) Patently Offensive Sexual Conduct*

Similarly, we find ample evidence in the record to support the jury's determination that the videotape depicted, in a

patently offensive way, sexual conduct specifically defined by the applicable state law. As noted above, § 28-807(15) specifically defines masturbation and prolonged contact with genitals as being included in "sexual conduct." Harrold's clearly depicted masturbation and prolonged contact with his genitals, in the absence of any context whatsoever, falls within the range of sexual conduct that creates a jury issue as to whether the conduct is "patently offensive" to an " 'average person, applying contemporary community standards.' " See *Miller v. California*, 413 U.S. at 24.

The jury was properly instructed that Harrold's depiction of sexual conduct must go substantially beyond customary limits of candor for it to be considered patently offensive. Suffice it to say, without repeating the visual details, that the evidence presented supports the jury's determination that the videotape depicted proscribed sexual conduct in a manner that was patently offensive when measured against the contemporary community standards.

### (iv) Value of Work

We next turn to our de novo review of whether the videotape, taken as a whole, lacked serious literary, artistic, political, or scientific value. The Court of Appeals concluded that the videotape lacked serious value, see *State v. Harrold*, 7 Neb. App. 842, 585 N.W.2d 532 (1998), and we agree with this determination.

As described more fully above, Harrold's videotape is virtually devoid of meaningful content. Aside from Harrold's largely repetitive display of contorted facial gestures, the only conduct depicted on the videotape is masturbation. The only discernible dialog on the videotape relates to that act of masturbation. Harrold's work does not express any comprehensible literary, artistic, political, or scientific message, and the videotape does not endeavor to be informative, enlightening, or persuasive in any manner. In short, we agree with both the jury and the Court of Appeals that the work lacks serious value, and it fails the third prong of the *Miller* test.

### (d) Conclusion

We determine that exhibit 2 depicted the type of sexual conduct appropriately regulated by state law, see, *Miller v.*

*California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973); § 28-807(15), and that the record supports the jury's determination that exhibit 2 was obscene within the meaning of *Miller* and § 28-807(10). Consequently, we conclude that exhibit 2 was obscene material and not entitled to First Amendment protection. The contrary determination of the Court of Appeals was error.

### 6. CHALLENGED EVIDENTIARY RULINGS

The Court of Appeals also found that the trial court erred in excluding certain evidence offered by Harrold. Specifically, Harrold offered (1) CableVision's rules and regulations concerning public access programming; (2) testimony from Grooman regarding the CableVision procedures regulating obscene and indecent material submitted for public access broadcast, whether Harrold's videotape was broadcast, and whether Grooman or CableVision was prosecuted for it; and (3) testimony from Harrold regarding his understanding of the CableVision rules and his knowledge of community standards. The trial court found that this evidence was not relevant and excluded it on that basis. The Court of Appeals determined that the county court abused its discretion in excluding the evidence, and the State assigns this determination as error.

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Rev. Stat. § 27-401 (Reissue 1995). All relevant evidence normally is admissible, and conversely, evidence which is not relevant is not admissible. See, Neb. Rev. Stat. § 27-402 (Reissue 1995); *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996). The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding it will not be reversed absent an abuse of discretion. *State v. Jackson*, 255 Neb. 68, 582 N.W.2d 317 (1998). A judicial abuse of discretion means that the reasons or rulings of the trial court are clearly untenable, unfairly depriving a litigant of a substantial right, and denying a just result in matters submitted for disposition. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998).

Relevance is a relational concept and carries meaning only in context. A right to introduce evidence depends upon there being an issue of fact that is of consequence to the determination of an action. See § 27-401. First, evidence may be irrelevant if it is directed at a fact not properly an issue under the substantive law of the case. Glen Weissenberger, Weissenberger's Federal Evidence Courtroom Manual (1995). Second, if the evidence fails to alter the probabilities of the existence or nonexistence of a fact in issue, the evidence is irrelevant. *Id.*

### (a) CableVision Rules

Harrold offered the CableVision rules governing public access television, arguing that they were (1) relevant evidence of contemporary community standards and (2) relevant to Harrold's intent to distribute obscene, as opposed to indecent, material. We will address each of these arguments in turn.

### *(i) Relevance to Contemporary Community Standards*

Harrold first argues that the CableVision rules provide relevant evidence of the contemporary community standards. A defendant in a criminal obscenity case has a right to introduce evidence pertaining to the community standard. *Main Street Movies v. Wellman*, 251 Neb. 367, 557 N.W.2d 641 (1997) (citing *State v. Little Art Corp.*, 189 Neb. 681, 204 N.W.2d 574 (1973), *vacated on other grounds* 414 U.S. 992, 94 S. Ct. 345, 38 L. Ed. 2d 231). The question, then, is whether the Cable-Vision rules pertained to the community standard.

The rules themselves are primarily concerned with technical aspects of public access broadcasting, such as when and where tapes must be provided to CableVision and when CableVision's studio facilities would be made available for the use of potential broadcasters. Section VII of the rules, however, pertains to "Program Content." That section defines obscenity in the exact language of § 28-807(10). The CableVision rules thus mention community standards, as part of the language borrowed from § 28-807(10) and thus secondhand from *Miller v. California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973). The rules do not, however, define community standards in any way, nor do the rules provide any examples or substantive guidance

regarding what material might or might not offend the community standards.

Given this fact, we are not persuaded that the CableVision rules would provide relevant evidence of community standards. The rules do nothing more than reiterate the definition of obscenity on which the jury was ultimately instructed by the court. The rules provide no guidance to the jury on how to determine community standards, and thus, they are not relevant to that issue. The trial court did not abuse its discretion in so finding.

### (ii) Relevance to Intent

Harrold also argues that the rules were relevant to an intent-based defense. To be found guilty of violating § 28-813(1)(a), the State must prove that the defendant "knowingly" printed, copied, manufactured, prepared, produced, or reproduced obscene material. Essentially, Harrold is claiming that he thought the material he produced and distributed was indecent but not obscene, and he offers the CableVision rules concerning indecency and obscenity in furtherance of this argument.

Section 28-807(5) defines "knowingly" as "having general knowledge of, reason to know, or a belief or reasonable ground for belief which warrants further inspection or inquiry of the character and content of any material, taken as a whole, described in this section, which is reasonably susceptible to examination by the defendant."

We have stated, with reference to this language:

> " 'It is constitutionally sufficient that the prosecution show that a defendant had knowledge of the contents of the material he distributes, and he knew the character and nature of the materials.' "
>
> . . . "To require proof of a defendant's knowledge of the legal status of the materials would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law. . . ."

*State v. American Theatre Corp.*, 196 Neb. 467, 471, 244 N.W.2d 59, 62 (1976) (quoting *Hamling v. United States*, 418 U.S. 87, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974)).

Harrold is attempting to prove, through this and other evidence, that although he was aware of the contents of the videotape, he did not know it to be legally obscene. Even if this were proved, however, it would not provide Harrold with an effective defense to the charge brought against him. The evidence presented at trial overwhelmingly demonstrated that Harrold, as the producer, director, and sole actor in the videotape, had sufficient knowledge of the contents thereof to satisfy the definition from § 28-807(5) set forth above.

The following colloquy from Harrold's trial testimony aptly illustrates the evidence that was presented:

Q. Did you copy the material onto the tape that was delivered to CableVision on September 14, 1995, and as Exhibit No. 1?

[Harrold]. Yes.

. . . .

Q. And it was you actually that distributed it or gave it to or circulated it to CableVision on September 14, 1995, correct?

[Harrold]. Yes.

Q. And when you did that tape and when you gave it to CableVision, you knew what was on the tape, correct?

[Harrold]. Yes.

Q. And you knew the nature and character of the tape?

[Harrold]. Yes.

In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998). Even assuming that the trial court erred in excluding evidence that might be relevant to Harrold's intent, we find that the evidence at trial indisputably establishes that Harrold had general knowledge of, reason to know, or a belief or reasonable ground for belief which warranted further inspection or inquiry of the character and content of the videotape. See § 28-807(5). Consequently, we conclude that any erroneous exclusion of evidence relevant to Harrold's intent was harmless beyond a reasonable doubt.

### (iii) Open Door

Harrold argued at trial, and the Court of Appeals agreed, that the prosecution "opened the door" to admission of the Cable-Vision rules during its cross-examination of Harrold. The critical exchange is as follows:

> Q. And you wanted your movies shown — or your videos shown after midnight because you thought that that might lessen the possibility that children or juveniles would be exposed to it, correct?
>
> [Harrold]. I couldn't answer that question 'cause I can't — I can't tell who's gonna be watching what.
>
> Q. You just asked to have it run after midnight because you like having it run after midnight, no other reason?

After that question, defense counsel objected and argued that the door had been opened to the introduction of the CableVision rules. Defense counsel argued that the answer to the prosecutor's question was that Harrold had asked to have the videos run after midnight because CableVision rules required indecent materials to show after midnight and that Harrold should be able to answer the question using CableVision rules. Ultimately, the last question was withdrawn, and the trial court reaffirmed its earlier ruling excluding the CableVision rules.

The doctrine of "opening the door," while recognized, has not previously been examined in depth by this court. In other jurisdictions, it has been said that the doctrine is a rule of expanded relevancy which authorizes admitting evidence which otherwise would have been irrelevant, in order to respond to (1) admissible evidence which generates an issue or (2) inadmissible evidence admitted by the court over objection. *Clark v. State*, 332 Md. 77, 629 A.2d 1239 (1993). The rule is most often applied to situations where evidence adduced or comments made by one party make otherwise irrelevant evidence highly relevant or require some response or rebuttal. See *Pool v. Superior Court*, 139 Ariz. 98, 677 P.2d 261 (1984). As the Maryland Court of Appeals stated:

> Generally, "opening the door" is simply a contention that competent evidence which was previously irrelevant is now relevant through the opponent's admission of other evidence on the same issue.

. . . .

>In sum, "opening the door" is simply a way of saying: "My opponent has injected an issue into the case, and I ought to be able to introduce evidence on that issue."

*Clark v. State*, 332 Md. at 85, 629 A.2d at 1243.

We find this analysis helpful to our determination. It seems obvious that one does not open the door to admit evidence that is inadmissible; instead, the door is opened when evidence that had *previously* been inadmissible then *becomes* admissible by virtue of some act of counsel or the parties. Compare *State v. Coffman*, 227 Neb. 149, 416 N.W.2d 243 (1987) (admission of improper evidence on one side provides no justification for other party to introduce incompetent or improper evidence in rebuttal).

With this in mind, we consider the effect of the question posed by the prosecution in the instant case. We have already determined that the CableVision rules were not relevant to the issue of community standards because they contained no information that would be helpful to the jury in that regard. This fact was in no way altered by the question posed to Harrold by the prosecution. Even after the question was asked, the CableVision rules were still irrelevant to the issue of community standards. Neither did the question inject some new issue into the case to which the rules would be relevant. To the extent that the rules were relevant to Harrold's intent to produce and distribute obscene material, their exclusion was harmless, as noted above, and this is true regardless of the question posed to Harrold on cross-examination.

In sum, while the prosecutor's cross-examination questions might have implicated the existence of the CableVision rules, the rules were not themselves evidence and the questions did not have the effect of causing the previously irrelevant CableVision rules to become relevant to any issue in the case. The trial court did not abuse its discretion in continuing to exclude them.

### (b) Grooman's Testimony

Harrold's arguments relating to the testimony of Grooman are to some extent addressed by our resolution of the issues relating

to the CableVision rules. To the extent that Harrold argues that Grooman's testimony would have been relevant to Harrold's intent, any error was harmless beyond a reasonable doubt, as noted above. We therefore consider the possible relevance of Grooman's testimony to the issue of community standards.

At trial, Harrold made an offer of proof on the issues regarding which he wished to examine Grooman. Much of this offer of proof was an attempt to establish foundation for the admission of the CableVision rules, and we have already disposed of this issue. Beyond that, Harrold's offer of proof included questions to Grooman regarding (1) Grooman's and CableVision's opinions regarding the obscenity of the videotape, (2) whether Harrold's videotape was actually broadcast on television, and (3) whether Grooman or CableVision was prosecuted for broadcasting the videotape. After the offer of proof was made, the trial court sustained the State's objection to the testimony.

Initially, we note that when Grooman was asked if he had reached an opinion regarding the obscenity of the videotape, he said that he had not. Since Grooman had no opinion, it could not have been an abuse of discretion for the trial court to exclude it.

Harrold asserts, however, that Grooman's offer of proof establishes that CableVision had a policy against broadcasting obscene materials, that the videotape was reviewed by Cable-Vision, and that CableVision showed the videotape. Therefore, argues Harrold, CableVision did not believe the videotape to be obscene, and this, claims Harrold, is evidence relevant to the community standards. The Court of Appeals evidently agreed, finding that "what CableVision decides to broadcast is both a measurement and source of community standards." *State v. Harrold*, 7 Neb. App. 842, 856, 585 N.W.2d 532, 543 (1998).

This court held in *Main Street Movies v. Wellman*, 251 Neb. 367, 371, 557 N.W.2d 641, 645 (1997), that the testimony of the Sarpy County Attorney was not admissible evidence of contemporary community standards, because his opinion "constitutes nothing more than an expression of his individual sense of the contemporary community standard." We stated that the county attorney's "knowledge, skill, experience, training, and education as a prosecutor do not qualify him as an expert in deter-

mining public opinion." *Id.* Consequently, we held that it was error for the trial court to rely on the county attorney's opinion of contemporary community standards in determining whether work was obscene. *Id.*

In the present case, the foundation for the proffered evidence is even more scant. There is absolutely no evidence that the opinions of the CableVision advisory board would qualify as properly informed guidance regarding community standards. Furthermore, Harrold's offer of proof does not even contain such opinions, but merely offers the inference that since the show was broadcast, the unidentified members of the advisory board must have found the videotape to not be obscene.

The Court of Appeals stated that "one permissible inference for the jury was that CableVision, like Harrold, considered the videotape at issue to be indecent and suitable for broadcast, but not obscene." *State v. Harrold*, 7 Neb. App. at 858, 585 N.W.2d at 544. Even assuming this inference to be permissible, it would be relevant only if CableVision's opinion regarding the videotape was itself admissible. It is not. Based upon the foundation presented in Harrold's offer of proof, we find that the proffered evidence lacked both relevance and foundation and that the trial court did not abuse its discretion in rejecting it.

Similarly, we see no relevance in whether or not Grooman or CableVision was prosecuted for the broadcast of the videotape. The prosecutor's exercise of discretion regarding prosecution provides no guidance to the trier of fact regarding contemporary community standards. Compare *Main Street Movies v. Wellman, supra.* The trial court did not abuse its discretion in excluding this testimony.

### (c) Harrold's Testimony

At trial, defense counsel also made an offer of proof relating to Harrold's testimony. Specifically, the defense wanted to ask Harrold questions regarding his knowledge of the CableVision rules and ask Harrold about his knowledge of the sexually explicit material available in the community.

We have previously addressed the relevance of the Cable-Vision rules themselves and Grooman's testimony regarding those rules. For the same reasons, we determine that the trial

court did not abuse its discretion in excluding Harrold's testimony on the same issue. We then turn to Harrold's testimony relating to community standards. In this regard, we must consider the testimony contained in Harrold's offer of proof:

Q. Okay. Are you familiar with what type of material is available in the community?

A. (There was no audible response.)

Q. As far as sexually explicit material.

[Harrold]. To a degree.

Q. Okay. And how do you come by your knowledge of what is available?

[Harrold]. Just from living in Lincoln, you know. I do it in my life.

Q. Okay. You testified earlier that you had viewed rentals that were available in the market, is that correct?

[Harrold]. Yes.

Q. And did you view materials which you believed to be obscene under the current community standards?

[Harrold]. I came across 'em, you know, I — I rented some videos where I got into 'em and I considered 'em to be obscene then I'd, you know, I kinda lost interest in watchin' it.

Q. Okay. That would conclude my offer of proof, Your Honor.

We find that the foregoing offer of proof lacks the foundational requirements necessary to make the evidence admissible under Nebraska law. Harrold's proffered testimony, even interpreted liberally, is nothing more than one individual's sense of whether certain unidentified videos, that have not been introduced into evidence, may be obscene under current community standards. See *Main Street Movies v. Wellman*, 251 Neb. 367, 557 N.W.2d 641 (1997). If interpreted literally, Harrold said nothing more than that he had rented movies which he believed to be obscene under contemporary community standards, and this testimony says nothing about the content of work that Harrold believes to violate contemporary community standards or what those standards might be. Consequently, nothing in Harrold's offer of proof would be helpful to the jury in evaluating community standards. Harrold's opinion lacked foundation

and relevance, and the trial court did not abuse its discretion in excluding it.

### (d) Conclusion

We find that the Court of Appeals erred in determining that the trial court abused its discretion in excluding particular evidence. The trial court did not abuse its discretion in the exclusion of evidence purportedly relating to community standards, and any error in excluding evidence relating to intent was harmless beyond a reasonable doubt.

### IV. HARROLD'S REMAINING ASSIGNMENTS OF ERROR

Because of its disposition of the case, the Court of Appeals did not reach the other assignments of error Harrold raised in that court. This court, upon granting further review which results in the reversal of a decision of the Court of Appeals, may consider, as it deems appropriate, some or all of the assignments of error the Court of Appeals did not reach. *Lange v. Crouse Cartage Co.*, 253 Neb. 718, 572 N.W.2d 351 (1998).

#### 1. ASSIGNMENTS OF ERROR

In his brief to the Court of Appeals, Harrold raised 43 assignments of error. Obviously, many of those alleged errors have been resolved in the context of the State's petition for further review. We have consolidated and restated Harrold's remaining assignments of error as follows: (1) The trial court erred in refusing to allow Harrold to ask the jury panel questions regarding community standards during voir dire and in refusing to quash the jury panel thereafter, (2) the trial court erred in refusing a jury instruction offered by Harrold and in overruling Harrold's objection to another jury instruction, (3) the verdict was not supported by sufficient evidence, and (4) Harrold received an excessive sentence.

#### 2. RESTRICTION OF VOIR DIRE

During the jury selection process, Harrold sought to ask the members of the venire several questions relating to community standards. Specifically, Harrold sought to ask the panel (1) whether they knew the contemporary community standard, (2)

whether they knew the limits of candor the community finds acceptable in presenting sexually explicit material, (3) how they knew the limits of candor the community finds acceptable in presenting sexually explicit material, (4) how their own views on the acceptable limits of candor in presenting sexually explicit material differed from those of the community, and (5) in what way their own views on the acceptable limits of candor in presenting sexually explicit material differed from those of the community. Based on the trial court's refusal to allow these questions, Harrold moved to quash the jury panel and then moved for mistrial. Harrold alleges that the trial court erred in refusing his questions and in overruling his subsequent motions and that this resulted in a violation of his rights to due process and trial by an impartial jury.

Generally, the extent to which parties may examine jurors as to their qualifications rests largely in the discretion of the trial court, the exercise of which will not constitute reversible error unless clearly abused, and where it appears that harmful prejudice has been caused thereby. *Yount v. Seager*, 181 Neb. 665, 150 N.W.2d 245 (1967).

The competency of a juror is generally presumed, and the burden is on the challenging party to establish otherwise. *State v. Krutilek*, 254 Neb. 11, 573 N.W.2d 771 (1998); *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998). The retention or rejection of a venireperson as a juror is a matter of discretion with the trial court. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999); *State v. Krutilek, supra*. The finding of the trial court as to the qualifications of a juror will not be set aside unless there has been a clear abuse of judicial discretion. *Losieau v. State*, 157 Neb. 115, 58 N.W.2d 824 (1953); *McColley v. State*, 116 Neb. 512, 218 N.W. 129 (1928).

The precise issue raised by Harrold was confronted by the Supreme Court in *Smith v. United States*, 431 U.S. 291, 97 S. Ct. 1756, 52 L. Ed. 2d 324 (1977). In that case, the defendant submitted five questions for voir dire which were rejected by the trial court. *Id*. One question inquired whether the jurors had any knowledge of the relevant contemporary community standards with regard to the depiction of sex and nudity. *Id*. The

remaining questions sought to uncover the source of the jurors' knowledge and their understanding of the community standards and to explore the jurors' knowledge of local law on the subject. *Id.*

On appeal, the defendant complained that the trial court had abused its discretion in refusing to ask the tendered questions. The Supreme Court rejected the argument, stating:

> We also reject petitioner's arguments that the prospective jurors should have been asked about their understanding of Iowa's community standards and Iowa law . . . . The particular inquiries requested by petitioner would not have elicited useful information about the jurors' qualifications to apply contemporary community standards in an objective way. A request for the jurors' description of their understanding of community standards would have been no more appropriate than a request for a description of the meaning of "reasonableness." Neither term lends itself to precise definition. This is not to preclude other more specific and less conclusory questions for *voir dire*. For example, it might be helpful to know how long a juror has been a member of the community, how heavily the juror has been involved in the community, and with what organizations having an interest in the regulation of obscenity the juror has been affiliated. The propriety of a particular question is a decision for the trial court to make in the first instance. In this case, however, we cannot say that the District Court abused its discretion in refusing to ask the specific questions tendered by petitioner.

431 U.S. at 308.

The Supreme Court's reasoning is persuasive, and the factual situation in *Smith v. United States, supra*, is essentially indistinguishable from the case at bar. In addition, we note that the issue of community standards is one which is addressed at trial and in the jury instructions and which is to be decided during the jury's deliberations based on the instructions and the evidence presented. Given that community standards are to be determined at trial, it is disingenuous for Harrold to argue that a juror should be disqualified from serving if he or she has *not* prejudged the issue. As the trial court observed:

What you want me to do is to make a determination that these jurors, if they say they don't know the community standard, is to conclude then that they're not competent to sit even though we haven't even told them the legal definition [of] what guidelines they're to follow.

The questions Harrold sought to ask the jury panel prior to trial would elicit no useful information and would be premature, where the jurors had not been provided with evidence or instructed on the issue of community standards. The trial court did not abuse its discretion in refusing the tendered questions and committed no error in denying the subsequent motions premised on the court's failure to ask those questions. Harrold's assignment of error is without merit.

### 3. JURY INSTRUCTIONS

Harrold claims that the trial court erred in overruling his objection to jury instruction No. 5. While assigned, however, this assignment of error was not argued in Harrold's brief to the Court of Appeals. Errors that are assigned but not argued will not be addressed by an appellate court. *Myers v. Nebraska Equal Opp. Comm.*, 255 Neb. 156, 582 N.W.2d 362 (1998). In any event, we note that Harrold's objection was premised on his assertion that "in order for a person to be held criminally liable for an obscene tape, that person has to either know or believe that the material is obscene." This premise was soundly rejected by the Supreme Court in *Hamling v. United States*, 418 U.S. 87, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974).

Harrold further claims that the trial court erred in refusing his tendered jury instruction No. 3. To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Koperski*, 254 Neb. 624, 578 N.W.2d 837 (1998). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id.*

Harrold's proposed instruction No. 3 provided:

> Evidence has been adduced that the videotape in question was delivered to Lincoln CableVision for broadcast on the public access channel. Your beliefs about whether sexually explicit materials should be broadcast on the public access channel are not to be considered in determining whether or not this videotape is obscene. In determining whether or not this videotape is obscene, you shall apply the same criteria you would apply for a videotape from a video rental establishment or an adult movie theater.

Assuming that this instruction was a correct statement of the law and was warranted by the evidence, we nonetheless find that Harrold has not demonstrated that he was prejudiced by failure to give the instruction. The instruction to "apply the same criteria" to be applied to a videotape from a rental establishment or adult theater would have been superfluous, as the jury was specifically instructed regarding the criteria necessary for the videotape to be found obscene, and those criteria properly stated the law. The jury was instructed regarding the proper criteria to apply in the present case, and absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict. *State v. White*, 249 Neb. 381, 543 N.W.2d 725 (1996), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998).

In short, the instructions given, taken as a whole, correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings. Harrold has demonstrated no prejudice resulting from the refusal of his tendered instruction and, thus, has shown no reversible error. This assignment of error is meritless.

### 4. SUFFICIENCY OF EVIDENCE

Harrold assigns several errors that generally challenge the sufficiency of the evidence to sustain his conviction. We have analyzed the evidence presented in this case at length in our discussion of the substantive issues presented on appeal. Based on that analysis, we conclude that the evidence in this case is amply sufficient to support the conviction. Harrold's assignments of error are without merit.

## 5. EXCESSIVE SENTENCE

Harrold claims that the $1,000 fine imposed by the trial court was an excessive sentence. A sentence within statutory limits will not be disturbed on appeal absent an abuse of discretion. *State v. Torres, ante* p. 380, 590 N.W.2d 184 (1999).

In this case, the trial court imposed the maximum fine available under the statute, but imposed no incarceration. The sentence imposed was within the statutory limits and was not an abuse of judicial discretion. Harrold's assignment of error is without merit.

## V. CONCLUSION

For the foregoing reasons, we conclude that the Court of Appeals erred in determining that Harrold's videotape was not obscene and that Harrold was prejudiced by certain evidentiary rulings. As a result, the Court of Appeals erred in determining that the cause should be dismissed. The assignments of error unaddressed by the Court of Appeals are without merit. Because we conclude that there was no reversible error by the county court, we reverse the judgment of the Court of Appeals and remand this cause with directions to reinstate the judgment of the district court which had affirmed the judgment of the county court.

REVERSED AND REMANDED WITH DIRECTIONS.

HENDRY, C.J., and MILLER-LERMAN, J., not participating.