STATE OF NEBRASKA, APPELLEE, V. ROBERT R. NASH, APPELLANT.
444 N.W.2d 914

Filed September 1, 1989.   No. 88-865.

Richard J. Bruckner for appellant.

Robert M. Spire, Attorney General, and Kimberly A. Klein for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

The defendant, Robert R. Nash, was convicted of unlawful possession of methamphetamine and was sentenced to 8 months in jail and fined $1,000 and costs. He has appealed and contends that the evidence was insufficient to sustain the verdict and that the trial court erred in overruling his motions to suppress wiretaps.

The evidence of the State consisted largely of the testimony of Kevin Florom, who was an eyewitness to the sale of methamphetamine to the defendant. Florom is 30 years old and is a resident of North Platte, Nebraska. Florom testified that he has used drugs since he was 16 years old and sold drugs from 1974 until 1986.

With respect to methamphetamine, Florom stated that he had used the drug over 100 times and that it affected his body by raising his body temperature, decreasing his appetite, and allowing him to go without sleep for up to a week at a time. He described methamphetamine as a white powder with a crystalline or chunky appearance, occasionally with a yellow tint to it, and with a certain odor that "you can't mistake for anything else." In addition, the drug has a bitter taste and may be smoked, dissolved in water and drunk, or injected. Florom stated that he himself preferred injection because of the instant high achieved by injection. When Florom sold methamphetamine, it was referred to as crank or crystal, which are simply two names for the same substance.

Florom stated that in 1986 he was a seller of methamphetamine for Monte Allen and William Roach, Jr., and at that time was living with Roach in a trailer house behind Bud's Repair on East 5th Street in North Platte. Allen was residing in Fort Collins, Colorado, and Florom had been acquainted with him when Allen lived in North Platte. Florom had been to Allen's home in Colorado to pick up crystal for distribution in North Platte. In addition, Allen had delivered crystal to North Platte on more than one occasion.

Florom testified that he met the defendant in 1980 when Florom was working as a bartender at the Platte Bar. Their relationship at this time was not related to drug dealings, and in fact the parties did not socialize together. Florom stated that although he personally never sold crystal to Nash, he was present when Allen sold the drug to Nash on December 1, 1986. Florom claimed that he had introduced Allen to Nash. According to Florom, he placed a call to Nash to inquire whether Nash was interested in buying any crystal, as Allen had a quantity of crystal that he needed to sell. Nash told Florom to come over to his house and see him, which both Florom and Allen then did.

All three individuals sat down at a table, and Allen reached into his pocket and pulled out an "eight ball" of crystal and handed it to the defendant. Florom testified that an eight ball of crystal is 3½ grams, or an eighth of an ounce, of methamphetamine. Nash then took his bowie knife and stuck it

into the bag, sampled the drug, and stated that "it's not too bad." Florom stated that earlier in the day, he, Allen, and Roach had divided the crystal into smaller quantities and had injected some of the drug at that time. Apparently, the drug injected by Florom was from the same lot of methamphetamine that later was broken down into $1/8$-ounce bags and distributed to Nash.

In terms of payment for the crystal, Allen told the defendant it would cost him $285, which the defendant paid to Allen at Florom's trailer behind Bud's Repair. Florom stated that all events transpired on December 1, 1986, in North Platte, Lincoln County, Nebraska.

Florom was not working for law enforcement and had never been an undercover informant.

The first time that Florom told authorities of the December 1 incident was in February of 1987, when he was in the Hastings Regional Center for treatment of drug and alcohol problems.

On cross-examination, Florom testified that he had been charged in March of 1988 with either distribution of methamphetamine or conspiracy to do so, but as of the date of trial he had not gone to court on the charge. In addition, he has been charged with two counts of felony nonsupport dating back to December of 1987. Since leaving the regional center, Florom has smoked marijuana three or four times and was arrested on July 26, 1988, for disturbing the peace and resisting arrest.

Florom's testimony concerning the sale of methamphetamine to the defendant on December 1, 1986, was corroborated by the testimony of James Parish, Melvin Messersmith, and Gerard Ruiz, members of the Nebraska State Patrol who were involved in the drug investigation, and by the record of a telephone conversation between the defendant and Florom.

Parish testified that he was involved in the investigation of Nash, beginning with surveillance, and later was made supervisor in charge of the investigation. The investigation of Nash began when the patrol received information from informants regarding numerous persons involved in trafficking in cocaine and methamphetamine in Lincoln County,

Nebraska. As a part of the investigation, a wiretap was installed on a telephone in the defendant's residence at 77 Maplewood Circle in North Platte. Several hundred calls were monitored at the Nash residence, and on December 1, 1986, an evidence call was monitored at the defendant's residence. An evidence call is a call of criminal nature and involves suspects, a particular transaction, or the discussion of criminal activity.

The December 1, 1986, call, which occurred at about 11:30 a.m., was monitored by Investigator Messersmith. Messersmith stated that the conversation indicated that there was a desire for a transaction involving crystal (methamphetamine) to take place. At trial, Messersmith read from the transcript of the recorded telephone conversation, which, with obscenity and vulgarity deleted, was as follows:

Nash answered the phone, "Nash." Florom: "Nashville. What are you doing?" Nash: ["]Oh, just sitting here watching T.V.["] Florom: "This is Kevin Florom." Nash: "Sure." Florom: "Well, how are ya doing." Nash: ["]Oh, pretty good, I'm trying to get to Cheyenne, but I don't think I'm going to get the job done." Florom: "Not going to get there today, hu [sic]?" Nash: "Na, it's ------ weather." Florom: "Ah, ya, ------ icy roads probably." Nash: "Ya, it's well I was gonna fly out." Florom: "Oh ya." Nash: "Ya they've got icy conditions." Florom: ["]Oh, they've got you grounded." Nash: "Ya, it's about 1500 feet going out of here ---- ------- storm front is just 60 miles west of here." Florom: "Ah really." Nash: "But ya know, getting there, I'd pick up ice sure as ----, so[.]" Florom: "Ya, you bet you would, you'll have probably enough to do the damage." Nash: "Ya, well I can't fly in that ----." Florom: "Ya." Nash: ["]What's going on." Florom: "Ya, I just was wondering if you might be interested in any crystal." [Nash:] "Um, why don't ya come over to the house and talk to me." Florom: "Okay, I was just, I was just going to ask if you was going to be home." Nash: "Ya." Florom: "But I didn't know if you'd understand ya know what I mean." Nash: "Ya, why don't ya come over and visit me for a while." Florom: "I will do that, I'll be right there." Nash: "Well okay." Florom:

"Thank ya." Nash: "Bye." Florom: "Uh-huh."
The actual tape recording was received in evidence.

Within several minutes of the call, Messersmith notified Parish that a criminal call had been intercepted. Parish immediately contacted Investigator Ted Mashek and arrangements were made for surveillance of the Nash residence. Parish then obtained a camera and accompanied Mashek to a location in the vicinity of 77 Maplewood Circle. Ruiz was also notified. Parish and Mashek drove to a location on Bare Street, which allowed them to observe 77 Maplewood Circle and any traffic leaving that area. Photographs were taken of vehicles which were observed at the Nash residence. A black Chrysler was observed, and the officers followed that vehicle to a Kwik Stop, where they saw Allen enter the Kwik Stop. After following the car for a short period, the officers terminated their surveillance.

On February 12, 1987, Investigator Robert Zeiler and Parish interviewed Florom, one of the participants in the December 1, 1986, incident, to determine whether he would cooperate with their investigation and to clarify details as to what had transpired on December 1. Florom agreed to cooperate and gave the officers a statement without being given any "deal" or promise in return. Florom made a second statement in December 1987 in which he admitted some inaccuracies in his first statement.

Roach and Allen were also contacted, but they were unwilling to cooperate with the patrol's investigative efforts.

The entire investigation ran from October 1985 until the middle of February 1987, with the focus on Nash being from November 1986 until February 1987. Nash was initially arrested in June of 1987.

Ruiz testified that he lived at 66 Maplewood Circle in North Platte. His involvement in the Nash investigation involved keeping track of Nash's home, observing vehicles and identifying people at the Nash home, and taking photographs. On December 1, 1986, Ruiz was asked to watch Nash's residence and to photograph any individuals or cars that were seen at the home. A photograph taken by Ruiz shows a black car with Utah plates, occupied by two men, which drove up to

Nash's garage and entered it. Fifteen to twenty minutes later, the men left the home and drove away.

The evidence of the State which has been summarized was sufficient, if believed, to permit the jury to find the defendant guilty beyond a reasonable doubt. Florom's credibility was a question for the jury.

The fact that none of the methamphetamine sold to the defendant by Allen in the presence of Florom on December 1, 1986, was seized and later determined by scientific analysis to be methamphetamine does not make the evidence insufficient to sustain the verdict. Florom's extensive experience in dealing with drugs was sufficient to permit him to testify that the drug sold to the defendant was methamphetamine.

> "Just as with any other component of the crime . . . the existence of and dealing with narcotics may be proved by circumstantial evidence; there need be no sample placed before the jury, nor need there be testimony by qualified chemists as long as the evidence furnished ground for inferring that the material in question was narcotics."

*United States v. Atkins*, 473 F.2d 308 (1973). See, also, *United States v. Sweeney*, 688 F.2d 1131 (1982).

In *State v. Watson*, 231 Neb. 507, 437 N.W.2d 142 (1989), almost a companion case to this case, we held:

> Proof of the identity of a substance by circumstantial evidence, including lay testimony by a person sufficiently familiar with the drug in question, may be sufficient to sustain a criminal conviction resulting from a drug prosecution, so long as this evidence establishes the identity of the drug beyond a reasonable doubt.

(Syllabus of the court.) We also held in *Watson, supra,* that

> [s]ome of the factors to be considered in determining whether the State has met its burden of proving the identity of a controlled substance beyond a reasonable doubt include: (1) the privacy or secretiveness of the transaction, (2) references made to the drug by the defendant and others, (3) testimony by witnesses who have a significant amount of experience with the drug in question, (4) high price paid for the substance, (5) behavior characteristic of sale and use of a particular

substance, (6) prior involvement by the defendant in drug trafficking, (7) corroborating testimony by officers or other experts as to the identification of the substance or the expected effects of the substance, and (8) sensory identification of the substance if the substance is sufficiently unique.

(Syllabus of the court.)

In this case there was substantial evidence concerning the privacy of the transaction, the references to the drug by the defendant and others, the significant experience of the defendant and Florom with the drug, the high price paid, the prior involvement of the defendant in drug trafficking, and the corroborating testimony by the officers.

The defendant's other assignment of error relates to the alleged overruling of the defendant's motions to suppress evidence obtained from the defendant by means of a wiretap. The transcript contains no motion by the defendant, or an order overruling a motion, relating specifically to a wiretap. The reference in the defendant's brief is to a motion filed January 21, 1988, relating to statements obtained from the defendant by State Patrol investigators during an interview with the defendant in the presence of his counsel. The January 21, 1988, motion was sustained by the trial court, and upon appeal by the State to a single judge of this court, the order was affirmed. *State v. Nash*, 228 Neb. 69, 421 N.W.2d 41 (1988).

The record shows that on June 3, 1986, an application was made for an order authorizing the interception of wire or oral communications at the residence of Richard Watson in North Platte, Nebraska, and an order granting the application was signed on that date.

On November 4, 1986, an application for a similar order for the residence of the defendant was made, and an order granting the application was signed on that date.

The November 4, 1986, application was supported by the affidavit of Mashek. The affidavit alleged that the purpose was to obtain information concerning drug transactions involving the defendant, other named persons, and other persons whose identities were unknown. The November 4 affidavit referred to the ongoing investigation and related in detail what other means

had been utilized or considered, including informants, the possibility of infiltration, evidence obtained through the wiretap at the Watson residence, and surveillance. The affidavit further explained why other methods would not prove successful.

The affidavit satisfied the requirements of Neb. Rev. Stat. § 86-705 (Reissue 1987) and was sufficient to justify the order signed on November 4, 1986.

The defendant's principal contention, that the wiretap was illegal, is based on his argument that the showing of the use of alternative methods, particularly surveillance, was inadequate.

> The ultimate burden of showing an unlawful interception rests upon the party against whom the fruits of the electronic surveillance are offered. *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976), *cert. denied* 429 U.S. 1000, 97 S. Ct. 530, 50 L. Ed. 2d 611 (interpreting the federal wire interception and interception of oral communications provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq. (1976), on which our telephonic communications act is patterned).

*State v. Brennen*, 214 Neb. 734, 742, 336 N.W.2d 79, 84 (1983). See *State v. Brennen*, 218 Neb. 454, 356 N.W.2d 861 (1984).

In *State v. Lozano*, 209 Neb. 772, 774-75, 311 N.W.2d 529, 531 (1981), we said:

> In *State v. Kolosseus*, 198 Neb. 404, 415, 253 N.W.2d 157, 163 (1977), we said: " 'There is no requirement that every investigative methodology be exhausted prior to application for a [wiretap] authorization. . . . It is sufficient that the government show that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation.' . . . We conclude that what is required under the first alternative is that the application make a full and complete disclosure of all that has been done so that the court may make a judgment as to whether more should be required before a tap is authorized." In *State v. Holmes and Beardslee*, 208 Neb. 114, 121, 302 N.W.2d 382, 386 (1981), we held that "it is not necessary for the State to

utilize all investigative techniques before making an application for a wiretap." We further noted there that " 'wire tap "procedures were not to be routinely employed as the initial step in criminal investigation," but it is equally true "that the statute does not require the government to use a wire tap only as a last resort." United States v. Kerrigan, 514 F.2d 35 (9th Cir. 1975); United States v. Staino, 358 F.Supp. 852, 856-7 (E.D. Pa. 1973).' " *Id.* at 122, 302 N.W.2d at 386.

An affidavit in support of an application for a wiretap is similar to an affidavit in support of an application for a search warrant and is to be tested in a practical and commonsense fashion. *State v. Holmes and Beardslee*, 208 Neb. 114, 302 N.W.2d 382 (1981).

This case involved an extensive investigation into the drug traffic in North Platte, Nebraska, that was carried on over a relatively long period of time. As in *State v. Hinton*, 226 Neb. 787, 415 N.W.2d 138 (1987), *Lozano, supra*, and *Holmes and Beardslee, supra*, law enforcement officials were attempting to identify the sources of the drugs, and the defendant's activities were but a part of the overall investigation.

The showing made in this case, when tested in accordance with the rules stated above, was adequate to support the order authorizing the wiretap.

The judgment is affirmed.

AFFIRMED.