STATE OF NEBRASKA, APPELLEE, V.
JAMES E. MYERS, APPELLANT.
603 N.W.2d 390

Filed December 10, 1999.    No. S-98-027.

Alan G. Stoler and Jerry M. Hug for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

James E. Myers was charged by information with criminal conspiracy, unlawful possession with intent to deliver a controlled substance, use of a deadly weapon to commit a felony, possession of a deadly weapon by a felon, and, for sentencing purposes, being a habitual criminal. Following trial, Myers was convicted on all counts, and he appeals.

## SCOPE OF REVIEW

■ In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued. *State v. Johnson*, 256 Neb. 133, 589 N.W.2d 108 (1999).

■ The decision whether to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998).

## FACTS

On September 18, 1995, law enforcement officials commenced an investigation regarding the murder of Lynette Mainelli. On April 19, 1996, upon the recommendation of the Attorney General of the State of Nebraska, the Douglas County

Attorney made application to the Douglas County District Court for an order authorizing interception of wire communications involving telephone numbers listed to Myers' mother, Annie Henley. The application sought interception of wire communications by Myers which might produce evidence regarding Mainelli's murder and the distribution of illegal drugs. The affidavit in support of the application set forth the following reasons for requesting the wiretap:

A narcotics distribution operation of any size will utilize the telephone, whether it be for contacting sources and distributors or for discussing such things as cost, quality, and payments. The telephone may be used for arranging and verifying meetings. In addition, persons involved in a homicide often use the telephone to assist in the destruction of evidence, construction of alibis, and intimidation of potential witnesses, as well as for purposes of contacting others involved in the homicide.

The objective of intercepting the wire communications was to record conversations revealing details of Mainelli's murder so as to ascertain the identity of individuals involved in the murder and to record conversations revealing details of suspected narcotics trafficking. Such information would be used by police to assess the nature and scope of the continuing conspiracy regarding the murder and drug trafficking; to discover the location of physical evidence; to track the manner in which moneys derived from the illegal narcotics transactions were utilized, concealed, laundered, or otherwise disposed of; and to locate the sources of the illegal narcotics.

Normal investigative procedures had been tried and failed or reasonably appeared to be unlikely to succeed if tried, and there was probable cause to believe that the telephone numbers listed to Henley were being used by Myers and others. The affidavit stated that the county attorney had probable cause to believe that Myers and others may have knowingly and willingly engaged in murder, the distribution of narcotics, and related offenses, and that Myers and others were conspiring with each other regarding these crimes.

On May 3, 1996, upon approval by the Attorney General, the Douglas County Attorney applied for another order authorizing the interception of wire communications involving a telephone number listed to Tara Lynam, an alleged girl friend of Myers.

The affidavit for this wiretap, referred to as "wiretap 2," was based on information obtained from the first wiretap, which we refer to as "wiretap 1." Based upon the information gained through wiretaps 1 and 2, search warrants were obtained and executed. As a result, numerous individuals, including Myers, were arrested.

Myers was subsequently charged with the murder of Mainelli, as well as the other charges listed above. Myers' motion to sever the murder charge was denied by the district court. Subsequently, the State moved to sever the murder and narcotics charges, and that motion was granted.

Prior to trial, Myers moved to suppress evidence derived from wiretaps 1 and 2, and the search warrants obtained pursuant to those wiretaps. Myers also moved in limine to keep out any references to a charge of first degree murder, as well as references to gangs and previous felony convictions. Myers' motion to suppress was overruled, while his motion in limine was sustained in part and overruled in part. The district court ordered that no references be made to the murder investigation, but allowed gang references.

Following opening statements, an article appeared in the Omaha World-Herald Midlands edition pertaining to Myers' trial. The article was entitled "Drug Ring Suspect's Trial Starts." The fifth paragraph of the article stated: "[Myers] also faces a separate murder charge." The defense voiced concerns that the jurors might have read the article and learned that Myers had also been charged with murder. Thus, the defense asked that the jurors be questioned. The jurors were then questioned about the article and polled. Eleven of the jurors and one of the alternate jurors admitted to knowing about and seeing the article which one of the jurors had brought into the jury room.

The jurors were subsequently questioned individually as to the extent to which they had read the article. One juror stated she had read only the headline and stopped because she realized that the article pertained to the trial for which she was a juror. Another said the jurors were "passing [the article] around," but that she read only the title of the article. Another indicated that he "just gave [the first page of the article] a quick glance over," but stated that the article contained only information which he already knew. He denied reading the article "word for word" and

did not think the article contained any evidence which he did not know about from opening statements or from the evidence presented the day before.

Another juror read the entire first page and learned that Myers was also on trial for murder. She was surprised, but thought she could disregard this fact. Another read only the headline of the article and noticed that it continued onto another page. He noticed the phrase "Murder Town Gangsters." Another juror read "bits and pieces" of the article in addition to the headline, but did not indicate she knew anything about the separate murder charge.

One juror, who read the entire article, stated, "I didn't realize that he had murdered somebody." She was concerned about her ability to put knowledge of the murder out of her mind and stated, "[R]ight now, it seems like he's guilty, but I haven't heard the other side . . . ." Another juror "briefly scanned through the whole article." She did not remember reading anything new. Another had read "bits and pieces" of the article, in addition to the headline, but did not learn anything new. One juror had read the headline and the first paragraph, and another juror had read only the headline.

One juror admitted bringing the newspaper to the jury room, reading the entire article, and learning that Myers had also been charged with murder. When she read the article, she said, "[O]h, my goodness" upon learning of the murder charge. She believed that she could be impartial because "[p]eople are charged [with crimes] all the time."

After the jurors had been questioned, Myers moved for a mistrial, which motion was overruled. Only the juror who said she was concerned about her ability to put the knowledge of the murder out of her mind was stricken from the jury panel and replaced with an alternate.

The jury found Myers guilty of all counts, and following a hearing, the district court sentenced Myers as a habitual criminal. Myers timely filed this appeal.

## ASSIGNMENTS OF ERROR

Myers claims that (1) the district court erred in failing to suppress evidence derived from unlawful wiretaps; (2) the affidavit for wiretap 2 failed to demonstrate probable cause for belief that

Myers had committed, was committing, or was about to commit a crime, and the order authorizing wiretap 2 was unlawfully issued because wiretap 1 was tainted; (3) the district court erred in failing to grant Myers' motion for mistrial, based on the jury's being exposed to a newspaper article concerning Myers' pending charge for first degree murder; (4) the district court erred in failing to sustain Myers' motion in limine with regard to gang references, as his right to a fair trial was prejudiced because there existed little probative value in comparison to the inflammatory effect; and (5) the district court erred in failing to dismiss the habitual criminal charge against Myers because the State failed to comply with the statutory requirements of Neb. Rev. Stat. § 29-2221 (Reissue 1995).

## ANALYSIS

We first address Myers' claims that the district court erred in failing to suppress evidence derived from unlawful wiretaps and that wiretap 2 was unlawful because wiretap 1 was tainted. Myers moved to suppress evidence obtained as a result of two wiretaps placed on telephones to which he had access. He claimed that the wiretaps violated his rights under the 4th, 5th, 6th, and 14th Amendments to the U.S. Constitution; article I, § VII, of the Nebraska Constitution; Neb. Rev. Stat. §§ 86-701 to 86-712 (Reissue 1994 & Supp. 1995); and Neb. Rev. Stat. § 29-822 (Reissue 1995).

Nebraska's wiretap statutes are found at §§ 86-701 to 86-712. Section 86-703 provides in part:

> The Attorney General or any county attorney may make application to any district court of this state for an order authorizing or approving the interception of wire, electronic, or oral communications . . . when such interception may provide or has provided evidence of the commission of the offense of murder . . . dealing in narcotic or other dangerous drugs, or any conspiracy to commit any such offenses.

Section 86-705 provides:

> (1) . . . Each application shall include the following information:

(a) The identity of the applicant;

(b) A full and complete statement of the facts and circumstances relied upon by the applicant to justify his or her belief that an order should be issued, including details as to the particular offense that has been, is being, or is about to be committed, a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted . . . .

(c) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) A statement of the period of time for which the interception is required to be maintained. . . .

. . . .

(3) [T]he judge may enter an ex parte order . . . authorizing or approving interception of wire, electronic, or oral communications . . . if the judge determines on the basis of the facts submitted by the applicant that: (a) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 86-703; (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; and (d) . . . there is probable cause for belief that the facilities from which or the place where the wire, electronic, or oral communications are to be intercepted are being used or are about to be used in connection with the commission of such offense or are leased to, listed in the name of, or commonly used by such person.

■ Nebraska law permits appropriate parties to apply to the district courts for authority to intercept wire or oral communications when such interception "may provide or has provided evidence of," among other things, "the offense of murder . . . dealing in narcotic or other dangerous drugs, or any conspiracy to commit any such offenses." See, § 86-703; *State v. Hinton,*

226 Neb. 787, 415 N.W.2d 138 (1987). In dealing with the requisites for obtaining authority to intercept wire and oral communications and with the contents of orders granting such authority, we have determined that in all substantive ways and in wording, these requisites are virtually identical to 18 U.S.C. § 2518 (1994). See, *State v. Hinton, supra*; *State v. DiMauro and Kessler*, 205 Neb. 275, 287 N.W.2d 74 (1980); *State v. Kolosseus*, 198 Neb. 404, 253 N.W.2d 157 (1977). As a result, we look to federal law to interpret Nebraska's intercepted communications statutes. See *State v. Hinton, supra*.

■ An application for an order permitting the interception of telephone conversations serves a similar purpose to that served by an application for a search warrant, that is, to present information sufficient to enable a detached and neutral judicial officer to find that probable cause exists to issue an order or a warrant. *United States v. Garcia*, 785 F.2d 214 (8th Cir. 1986); *State v. Hinton, supra*. The test for issuance of a wiretap warrant pursuant to 18 U.S.C. § 2518 is whether the sworn information before a court is of sufficient apparent reliability to justify a neutral judicial officer in finding that there is probable cause to believe that an offense has been or is being committed. *United States v. Abramson*, 553 F.2d 1164 (8th Cir. 1977).

■ In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued. *State v. Johnson*, 256 Neb. 133, 589 N.W.2d 108 (1999). An affidavit in support of an application for a wiretap is similar to an affidavit in support of an application for a search warrant and is to be tested in a practical and commonsense fashion. See, *State v. Nash*, 233 Neb. 318, 444 N.W.2d 914 (1989); *State v. Holmes and Beardslee*, 208 Neb. 114, 302 N.W.2d 382 (1981).

We therefore examine the contents of the affidavit to determine whether the requirements of § 86-705(3) have been satisfied. Each of the requirements of § 86-705(3) must be shown by proof sufficient to support a finding that those facts exist. See

*State v. Hinchion, DiBiase, Olsen, and Cullen*, 207 Neb. 478, 299 N.W.2d 748 (1980).

Myers complains that the district court made no specific references to the evidence presented or findings of fact and that there is no way for this court to apply the appropriate standard of review for factual findings. In *State v. Osborn*, 250 Neb. 57, 67, 547 N.W.2d 139, 145 (1996), we stated that "[h]enceforth, district courts shall articulate in writing or from the bench their general findings when denying or granting a motion to suppress. The degree of specificity required will vary . . . from case to case."

■ Our purpose in *Osborn* was to direct the trial courts to articulate findings of fact, which may be indispensable to a proper appellate review. We still adhere to that reasoning, but note that in the case at bar, appellate review is based upon the four corners of the affidavit. See *State v. McCleery*, 251 Neb. 940, 560 N.W.2d 789 (1997). Since we consider only the facts set forth in the affidavit, we can effectively determine whether the requirements of § 86-705(3) have been met. In passing on the validity of an order to intercept wire or oral communications, we consider only information brought to the attention of the magistrate. See *State v. Hinchion, DiBiase, Olsen, and Cullen, supra.*

PROBABLE CAUSE REGARDING MURDER
TO SUPPORT WIRETAP 1

The following is a summary of the relevant facts set forth in the affidavit as to probable cause regarding the murder of Mainelli:

Omaha police officers were investigating the murder of Robert Flowers. The suspect in the shooting was identified as Charles Duncan, who at the time of the murder was seen with a female later identified as Mainelli.

After the shooting, Duncan and Mainelli fled to the residence of Sherry Anderson, a friend and neighbor of Mainelli's. While there, Duncan made several telephone calls and recounted the shooting to Anderson. Myers and several black males associated with the "Murder Town Gangsters" came to the residence, and

Myers was heard to say that if Duncan needed Myers to "shut up" the witnesses, he could do that.

Mainelli later told police that Myers and three other black males had come to Anderson's residence and that during a conversation, Myers said something similar to, " '[Y]ou can't let that white bitch out of your sight until this is over.' " In addition, the night Flowers was killed, Anderson heard Myers tell Mainelli to watch the females who were in the car with Flowers so that Myers could "take them out" and that he would kill any of the witnesses who talked about Flowers' murder.

On September 18, 1995, Mainelli was found dead in her apartment from two gunshot wounds to the head. Two .22-caliber Remington shell casings were located in the bedroom near the body. Anderson told police that she had gone to Mainelli's apartment at approximately 11 p.m. on September 17 and that she believed Mainelli had male company at that time. Darnell Tatum, who had been dating Mainelli, said he knocked on her apartment door between 11:45 p.m. on September 17 and 1 a.m. on September 18, but that no one answered. However, he believed someone was in the apartment because a light came on after he knocked.

A confidential source, who was not on probation or parole and had provided information to police which had led to numerous arrests and the seizure of narcotics, informed the police that Myers and Tim Sanders had severely beaten Blandon Grayer because he had cooperated with police in the investigation of Flowers' murder and that Myers wanted to send a message that you do not "snitch" on Murder Town Gangsters.

When police interviewed Myers, he told them he had had an intimate relationship with Mainelli which was cut short when he went to prison, but claimed that he was with a girl friend, Edwina Wilson, on September 17, 1995, the night of Mainelli's murder.

Police later arrested Demond Briggs for being a felon in possession of a firearm. The pistol obtained was a "Jennings .22-caliber model J-22 semiautomatic pistol, serial number 685824, chrome with black grips." Ballistic tests showed that this was the weapon used in Mainelli's murder. Briggs told

police he had purchased the pistol from Edward Wilson in December and that Wilson and Myers were associates.

Edwina Wilson, Edward Wilson's sister, reported that Myers had assaulted her at her residence because she had confronted him about Mainelli's death. Edwina Wilson also identified the pistol seized from Briggs as a pistol Myers had once given her and claimed that she had returned the pistol to Myers in September of the previous year. Myers had told her that if the police came by, she was to tell them he had been with her the night Mainelli was killed and not to be specific about the time he actually came home. Edwina Wilson told police that Myers had left her apartment on the night of Mainelli's murder and that he had not returned until Monday, September 18, 1995, between 5 and 6 a.m.

Edward Wilson told police that he, Sam Edwards, Grayer, and Alvin Morris accompanied Myers and Ronnie Cross to a Bible study on September 17, 1995. After leaving the church, Myers drove to the apartments where Mainelli lived. Myers got out, put on a pair of brown work gloves, slid a round into the chamber of a small pistol, and left for an hour to an hour and a half. Upon his return, Myers took off the gloves, pulling them over the pistol. Myers later got out of the vehicle and gave Edwards a small ball-like article that looked like brown work gloves.

Edward Wilson later obtained the pistol from Edwards. When Edwards handed Edward Wilson the pistol, it was concealed inside a pair of brown work gloves. Wilson told the police that he had seen the pistol in Edwina Wilson's possession in the summer of 1995. This gun was eventually sold to Briggs and was seized by the police when Briggs was arrested.

Edward Wilson told police he was later taken to a Best Western motel in Council Bluffs, Iowa, and threatened by Myers, Sanders, Edwards, Cross, James Benford, Cameron Hollis, and Torraz Davis. Police confirmed that Sanders had obtained a room at a Best Western motel in Council Bluffs on December 19, 1995. In addition, Edwina Wilson reported a second assault by Myers, and when police questioned him, they observed that Myers had a hand-held police scanner.

Without further detailing the contents of the affidavit, we conclude that the affidavit was sufficiently detailed and of suffi-

cient apparent reliability to warrant a finding by a neutral judge that there was probable cause to believe that Myers and parties unknown had committed a murder and were conspiring in its coverup, that communications concerning these offenses would be obtained through interception of Myers' telephone conversations, and that the telephones at Myers' home would be used in the commission of these offenses. Therefore, we conclude that the requirements of § 86-705(3)(a), (b), and (d) have been satisfied.

### PROBABLE CAUSE REGARDING NARCOTICS TRAFFICKING TO SUPPORT WIRETAP 1

The following summary of facts relates to the conspiracy to distribute narcotics:

Narcotics investigators know that narcotics trafficking precludes direct person-to-person discussions and that a distribution structure of any size will use a telephone for contacting sources and distributors from the top to the bottom of the organization regarding payments, distribution, supply, and marketing. When personal meetings are necessary, the telephone and cryptic messages will be used to schedule such meetings.

Pen registers were installed on two telephone numbers which were listed in the name of Henley, Myers' mother. A pen register is an electronic device that prints out the number dialed or numbers calling into a particular telephone number. Records showed that Myers called Edwards and Sanders numerous times. In addition, from December 1995 to February 1996, Myers' pager received over 3,200 pages. Messages left on the pager were in code. Officers believed, based on past experience in conducting gang and narcotics investigations, that this type of messaging system and high volume of calls were indicative of narcotics activity.

Myers and other gang members were observed by police via drive-by surveillance and fixed surveillance coming and going from Myers' residence at 2018 North 30th Street. Drive-by surveillance of Myers, Edwards, and Sanders established the registration and ownership of various vehicles operated by Edwards and Sanders and that Myers operated a vehicle registered to Lynam. These vehicles repeatedly came and went from

Myers' residence. Police also noted that some parties were admitted to the residence, while others were turned away.

On February 26, 1996, an anonymous person reported having been inside Myers' residence and stated that Myers was in possession of firearms, narcotics, crack cocaine, and a large amount of U.S. currency, which Myers had stated was from the sale of crack cocaine. Surveillance also disclosed lookouts posted at the residence.

On March 21, 1996, police contacted a confidential source who was not on parole or probation and who had proved reliability in the prior 3 years by providing information that led to the issuance of numerous search warrants, felony arrests, and convictions for crack cocaine. While wearing a "wire," the source purchased crack cocaine from Myers at 2009 North 31st Street. An attempt was also made to purchase cocaine from Myers at his residence, 2018 North 30th Street, but Myers refused. The source was advised that Myers would be obtaining a larger quantity of crack cocaine if the source wanted to return. Police were also told by the director of the housing authority where Myers lived that other residents had complained that there were weapons at Myers' residence and that Myers was selling drugs.

Subsequent video surveillance showed various people, known and unknown, coming and going from Myers' residence. Myers was seen meeting another black male, walking to 2018 North 30th Street, going inside, and returning. The party outside was seen counting money, and an exchange was observed. After reviewing the videotape, a trained narcotics investigator stated that the exchange was indicative of a narcotics transaction. Other parties on the videotape who subsequently knocked at the residence were not allowed inside.

Without further detailing the contents of the affidavit, we conclude that it was sufficiently detailed and of sufficient apparent reliability to warrant a finding by a neutral judge that there was probable cause to believe that Myers and parties unknown were involved in a conspiracy to traffic narcotics, that communications concerning this offense would be obtained through the interception, and that the telephones at Myers' home would be used in the commission of this offense. Therefore, we conclude

that the requirements of § 86-705(3)(a), (b), and (d) have been satisfied.

### OTHER INVESTIGATIVE TECHNIQUES

Myers claims that the affidavit for wiretap 1 failed to demonstrate that other investigative techniques were tried and failed, were unlikely to succeed if tried, or were too dangerous. We disagree.

The affidavit recited that normal investigative techniques had succeeded to a limited degree in obtaining evidence against Myers and others with regard to the murder of Mainelli but had failed to provide sufficient evidence against all of the conspirators involved in the murder.

Drive-by surveillance yielded only limited results and drew attention to the officers in the housing district. This surveillance was not effective because officers observed that Myers did not have a vehicle that he typically drove. Myers either borrowed a vehicle or obtained a ride for transportation. Also, Myers was in possession of a portable scanner that had the capability to monitor radio traffic between law enforcement officers. Surveillance from a fixed position provided only a view of the southern access of Myers' residence, and it was difficult for officers to maintain long-term or daily moving surveillance without coming to the attention of Myers. The inspection of trash discarded by Myers was not possible in that the housing area relied on large community trash receptacles, and officers attempting to locate such trash would draw undue attention to their presence.

Information from Edward Wilson did not give a full accounting of Myers' actions and would not lead to a successful prosecution of Myers or others involved in the conspiracy. At the time the affidavit was submitted, there were no parties willing to come forward and testify against Myers involving his narcotics activity.

Although investigators may not use wiretaps or eavesdropping devices as the first step in a narcotics investigation, neither must such devices be used only as a last resort; nor must an affidavit supporting a request for permission to wiretap or eavesdrop explain away all possible alternative techniques of investigation. *State v. Hinton*, 226 Neb. 787, 415 N.W.2d 138

(1987); *State v. Whitmore*, 221 Neb. 450, 378 N.W.2d 150 (1985); *State v. Golter*, 216 Neb. 36, 342 N.W.2d 650 (1983). See, also, *United States v. Garcia*, 785 F.2d 214 (8th Cir. 1986). We conclude the State has demonstrated that investigative techniques had been tried and had failed to produce sufficient evidence to obtain the warrants required and that there was probable cause to find that normal investigative techniques would not produce sufficient results. Therefore, § 86-705(3)(c) has been satisfied.

### PROBABLE CAUSE REGARDING NARCOTICS TRAFFICKING TO SUPPORT WIRETAP 2

Myers next asserts that the affidavit for wiretap 2 failed to demonstrate sufficient probable cause for issuance of the order. The affidavit for wiretap 2 was similar to the affidavit for wiretap 1 and, in summary, stated the following:

A telephone number was listed to Lynam at 3130 Chicago Street, apartment No. 7, Omaha, Nebraska. Based in part upon wiretap 1, Omaha police officers believed that Lynam's telephone was being used by Myers and others in committing the offenses of murder and conspiracy to commit or to cover up the murder and the possession, distribution, and dispensing of illegal narcotics, controlled substances, and other dangerous drugs.

While monitoring the telephone conversations at Myers' residence, officers confirmed that Myers was also receiving calls at Lynam's residence. He received calls from unidentified coconspirators at Lynam's residence via a three-way calling feature initiated by Henley, utilizing a telephone at her residence.

During one telephone call to Myers' home, the caller identified himself as "Paco's brother." The parties spoke cryptically and discussed whether going to California for "4.7" was a good idea when Myers could drive 10 hours less for "4.8." The caller told Myers that the Chevy pickup, " 'the green one,' " could possibly go on Tuesday. Police believed this to be a reference to marijuana. During another intercept, Myers asked his mother to locate Paco's brother's pager number and to call the pager number. Another intercept disclosed that Myers needed to rent a vehicle for a possible trip the next day. Myers was subsequently observed leaving Atchley Ford, driving a rented Ford Taurus. On

April 27, 1996, a number of calls were intercepted which show that Myers went to Denver, Colorado, to obtain cocaine.

On April 30, 1996, Myers spoke to a party and stated that by driving, he still came up with " 'twenty nine five.' " The party tells Myers that the next time Myers goes to Denver, there "won't be any 'bullshit.' " Myers tells the party he does not know if he is going back to Denver on Friday, and the party says he will call Myers back the next day.

Without further detailing the contents of the affidavit, we find that it was sufficiently detailed and of sufficient apparent reliability to warrant a finding by a neutral judge that there was probable cause to believe that Myers and parties unknown were involved in a conspiracy to traffic drugs, that communications concerning these offenses would be obtained through the interception, and that the telephone at Lynam's home would be used in the commission of this offense.

### OTHER INVESTIGATIVE TECHNIQUES

We also conclude that the affidavit for wiretap 2 demonstrated that other investigative techniques were tried and failed, were unlikely to succeed if tried, or were too dangerous for the same reasons as wiretap 1.

Normal investigative techniques had succeeded to a limited degree in providing evidence against Myers and others, but these methods failed and appeared unlikely to be successful in the future for obtaining evidence against Myers, Edwards, Sanders, Grayer, Cross, Morris, Benford, Hollis, and others unknown relative to the objectives set forth in the affidavit.

In conclusion, we find that Myers' assigned errors relating to the failure to suppress the evidence obtained from wiretaps 1 and 2 to be without merit. The ultimate burden of showing an unlawful interception rests upon the party against whom the fruits of an electronic surveillance are offered. *State v. Nash*, 233 Neb. 318, 444 N.W.2d 914 (1989). Myers has failed to establish that the wiretaps were unlawfully ordered. Having determined that wiretaps 1 and 2 were properly issued, we conclude that the district court did not err in failing to suppress the evidence obtained pursuant to the wiretaps or in suppressing the

evidence that was obtained pursuant to the search warrants based on the wiretaps.

## Mistrial

We next address whether the district court erred in denying Myers' request for a mistrial based on the jury being exposed to a newspaper article containing a reference to Myers' pending charge for first degree murder.

On the second day of the trial, the jury was polled, and it was discovered that several members of the jury had read a newspaper article and learned that Myers was charged with murder in a separate case. One of the jurors was stricken, but the motion for mistrial was overruled.

A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Kirksey*, 254 Neb. 162, 575 N.W.2d 377 (1998). Where jury misconduct in a criminal case involves juror behavior only, the burden to establish prejudice rests on the party claiming the misconduct. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998).

In *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997), we were guided by the rule that in order for a verdict to be set aside because of the prejudicial effect of a newspaper account on jurors, there must be evidence presented that the jurors read the newspaper account and that the account was unfair or prejudicial to the defendant. A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such conduct was prejudicial to the extent that the defendant was denied a fair trial. *Id.*

The State argues that no jury misconduct actually occurred because prior to reading the article, the jurors had not been admonished not to read newspaper accounts of the trial. We disagree. The jurors had been admonished not to discuss the case among themselves and had been told not to formulate any opinions before the case was submitted to them. Reading about the case in the newspaper constituted jury misconduct.

We next consider whether the article read by the jurors prejudiced Myers' right to a fair trial. Eleven of the jurors and one of the alternates saw the newspaper article and read it to some extent. Three of the jurors admitted to having read the entire article and specifically mentioned the murder charge when interviewed. One of these three jurors was stricken, but two of the jurors who remained on the jury had been exposed to the material about which Myers complains.

The determination of whether to grant a mistrial rests not only on what the jurors say on interrogation, but also upon the nature of the published material, together with all other facts and circumstances in the record. *State v. Anderson, supra.* The decision whether to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Kirksey, supra.* A judicial abuse of discretion means that the reasons or rulings of the trial court are clearly untenable, unfairly depriving a litigant of a substantial right, and denying a just result in matters submitted for disposition. *State v. Harrold,* 256 Neb. 829, 593 N.W.2d 299 (1999).

Three jurors who read the article in its entirety specifically remembered the fact that Myers also faced a murder charge. Upon being questioned about the article, it was the first thing mentioned by those jurors. All three expressed some degree of surprise upon learning about the murder charge.

The district court had sustained a motion in limine excluding and prohibiting the State from admitting evidence regarding the murder charge. Myers' motion in limine was premised on the fact that knowledge of a separate murder charge was more prejudicial than probative, and the district court concluded that Myers' murder charge and the evidence in support of that charge was prejudicial enough to exclude the fact from this trial. Thus, we conclude that the newspaper article was prejudicial to Myers.

Therefore, the district court abused its discretion in denying Myers' motion for a mistrial, and Myers is entitled to a new trial.

The courts, through their bailiffs, are required to ensure that juries do not bring extraneous information into the jury room. In this instance, the jurors passed around a newspaper in the jury

room and read accounts of the trial. This kind of activity cannot and will not be tolerated.

### REFERENCE TO GANG MEMBERSHIP

Finally, Myers argues that the district court erred in failing to sustain his motion in limine in regard to gang references. Prior to trial, Myers moved in limine to keep the State from introducing evidence or testimony relating to gangs or gang activity, specifically the "19th Street" gangs or the Murder Town Gangsters. Myers claims that the evidence was irrelevant, that the prejudicial effect to Myers far outweighed any probative value, and that any prejudice could not be corrected by instructing the jury.

At trial, police officers for the city of Omaha testified that Myers and members of the Murder Town Gangsters were under investigation. Certain individuals who had participated in the intercepted telephone conversations testified to gang-related references in the telephone conversations. For instance, the number "19" entered into a pager meant 19th Street to a member of the Murder Town Gangsters. Myers asserts that the nature and quantity of the gang evidence served merely to inflame the jury and was not necessary to the State's case.

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Rev. Stat. § 27-401 (Reissue 1995). Neb. Rev. Stat. § 27-403 (Reissue 1995) excludes relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice.

The State argues that evidence regarding gang membership played a much greater role and was relevant in the overall scheme of the trial. We agree. The evidence established that Myers would sell drugs only to members of his own gang. Myers' nephew testified that the people to whom Myers sold were members of a gang called the "19th Street Murder Town Gangsters." Surveillance of Myers' residence confirmed that not everyone who sought entry was allowed inside even though Myers was observed to be present in the residence. Some members of the gang testified they could reach Myers by dialing his

pager number and entering the number "19." The record establishes that the people who associated with Myers were in the same gang and were the people with whom Myers did business. We conclude that the evidence of Myers' gang-related activities is relevant.

Generally, the evidence which the State offers against a criminal defendant is prejudicial. The issue is whether the evidence was unfairly prejudicial. We conclude that the evidence regarding Myers' gang-related activity did not create an undue prejudice. His gang affiliation was part of the drug-dealing activities and conspiracy which were under investigation by police. Evidence established that Myers did business only with gang members. Thus, the district court did not abuse its discretion in admitting testimony regarding Myers' activity within the gang.

## CONCLUSION

The district court abused its discretion in not granting a mistrial in light of the jury's misconduct. Therefore, we reverse Myers' convictions and remand the cause for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

CONNOLLY, J., concurring.

I concur. However, I am disturbed by the multiple occurrences in recent years of newspaper articles slipping past bailiffs and ending up in the hands of jurors in Douglas County. See, *State v. Jackson*, 255 Neb. 68, 582 N.W.2d 317 (1998) (juror given newspaper during recess); *State v. Kirksey*, 254 Neb. 162, 575 N.W.2d 377 (1998) (we declined to address assignment of error regarding trial judge's comments about newspaper found in jury room); *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997) (newspaper in jury room); *State v. Carter*, 241 Neb. 645, 489 N.W.2d 846 (1992) (juror in possession of newspaper during deliberations). See, also, *State v. Anderson, supra* (Caporale, J., concurring) (wondering where bailiff was when newspaper was taken into jury room).

It is the duty of the trial judge to admonish the jury regarding bringing extraneous materials into the jury room. However, it is the bailiff's duty to see that that warning is carried out. The Handbook for Bailiffs During Jury Duty, section 3 at 3-4 (1998), which was prepared by the Nebraska State Court

Administrator's Office, states, "B. Specific Duties Pertaining to Jury Trials are to: . . . . Guard against and prevent the introduction into the jury room or use of extraneous items, including laptop computers and reading material."

Obviously, if a bailiff is to fulfill his or her duty, the bailiff is going to have to be present each time the jury is admitted into the jury room.